## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02676-NYW-MDB

KHALFAN KHAMIS MOHAMED,

      Plaintiff,

v.

SANTISTEVEN, in his individual and official capacities,
MEDRANO, in his individual and official capacities,
CONROY, in his individual and official capacities,
TRUE, in his individual and official capacities,
SEROSKI, in her individual and official capacities,
TURNER, in her individual and official capacities, and
UNITED STATES OF AMERICA,

      Defendants.

---

## DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

---

Defendants move to dismiss Claims 1 through 9, 12, and 13 of the Second Amended

Complaint, ECF No. 75, under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

### BACKGROUND

Plaintiff Mohamed, an inmate incarcerated at the United States Penitentiary–

Administrative Maximum ("ADX") in Florence, Colorado, has used hunger strikes as a form of

protest against the Federal Bureau of Prisons ("BOP").  *See, e.g.*, ECF No. 75 at 3 § A and ¶ 45.

This case arises from an incident that he alleges triggered his three-week hunger strike in 2020

and his treatment during and after that hunger strike.

Plaintiff claims that he was denied his right to place a total of four social telephone calls

in October and November 2019 and that he filed an administrative grievance for the "lost calls."

*Id.* ¶¶ 3, 5.  Defendant Turner later allegedly told Plaintiff that she was going to "teach [him] a

lesson" by blocking his use of three local, voice-over-internet-protocol ("VoIP") telephone numbers, which Plaintiff said he used to communicate with this family in Africa. *Id.* ¶¶ 7, 10, 26. Turner justified this action on the grounds that the prison could not verify the identity of the VoIP call recipients.[1] *Id.* ¶¶ 14, 26. Plaintiff contends that Turner blocked the numbers in retaliation for his grievance about the lost calls, violating his First Amendment rights. *Id.* ¶¶ 27, 219. He also alleges that blocking the numbers violated the Religious Freedom Restoration Act ("RFRA"), because it imposed a "substantial burden" on his religious activity. *Id.* ¶¶ 33-41. He alleges that, as a Muslim, he is "religiously ordained to maintain" "close and healthy relationship[s]" with approximately 50 family members or relatives "as much as possible," and he could not do so using regular mail, which was unreliable, or regular phone service, which was twice as expensive as VoIP calls. *Id.* ¶¶ 10, 12, 34, 36-37. He splits his money among "calls, commissary, essential needs to supplement the food I am fed and other necessities." *Id.* ¶ 10. However, he concedes that over the past two-and-a-half years, he has been able to use the regular telephone system for free, due to COVID-19 relief legislation. *Id.* ¶ 221.

"As a result of [Turner's] retaliatory act," Plaintiff declared a hunger strike on March 29, 2020. *Id.* ¶ 31. During the three-week hunger strike, Plaintiff acknowledges that: (1) he was seen by medical personnel at least six times, *id.* ¶¶ 82, 110, 123, 157, 167, 169; (2) he spoke to a psychologist, *id.* ¶¶ 51, 108; (3) staff brought him food and water at mealtimes, *id.* ¶¶ 56, 74, 95;

---

[1] Use of VoIP phone numbers or call forwarding systems is not permitted under longstanding BOP policy. *See* BOP Program Statement P5264.08, *Inmate Telephone Regulations*, § 8, *available at* https://www.bop.gov/policy/progstat/5264_008.pdf (last visited November 29, 2022) ("To ensure the safety and security of the institution and community, inmates must place all personal telephone calls through the ITS and must not circumvent it via call forwarding, including automatic electronic forwarding or any similar telephone function."). The Court may take judicial notice of the BOP Program Statement without converting this motion to dismiss to one for summary judgment. *United States v. Tidzump*, 841 F.3d 844, 845 n.1 (10th Cir. 2016) ("We may take judicial notice of the BOP's program statement.").

(4) Defendants or other staff encouraged him to end the strike to avoid negative health consequences, *id.* ¶¶ 102, 118, 140, 161, 163; and (5) when a nurse said Plaintiff might need to be "forcefully fed," Plaintiff refused to alter his behavior, *id.* ¶¶ 141, 161, 172.  After Plaintiff ended his hunger strike, he continued to be monitored and treated by medical personnel.  *Id.* ¶¶ 177, 192, 194, 196-97, 213.

Despite this, Plaintiff alleges that Defendants did not meet his needs during and after the hunger strike.  Based on those allegations, he asserts claims for constitutional claims for violations and claims under the Federal Tort Claims Act ("FTCA") for battery and negligent supervision.  Plaintiff seeks compensatory and punitive damages against the individual defendants and an injunction ordering Defendants to "adhere with the law and existing BOP-regulations at all time[s]," "especially at the time I'm in Hunger Strike."  *Id.* at 30.

Defendants now move to dismiss all of Plaintiff's claims, save for his two FTCA claims alleging battery (Claims 10 and 11).  For the Court's convenience, a summary chart describing the claims, relief sought, and bases for dismissal is attached as Exhibit 1.

## ARGUMENT

### I.    There is no *Bivens* remedy for Claims 1 or 3 through 9.

Plaintiff brings eight *Bivens* claims seeking damages against the six individual defendants, but the Court cannot imply the existence of a *Bivens* remedy for these claims.

In *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Supreme Court established a two-part inquiry for deciding whether to imply a *Bivens* remedy.  First, a court must ask whether the claim arises in a "new context" different from the only three "instances in which the Court has

approved of an implied damages remedy under the Constitution itself."[2]  *Id.* at 1855.  Second, the court must consider whether there are any alternative remedies to a damages suit, or whether any other "special factors counsel[] hesitation" in creating a new damages remedy.  *Id*. at 1857-58.

Most recently, the Supreme Court recognized that "those steps often resolve to a single question:  whether there is any reason to think that Congress might be better equipped to create a damages remedy."  *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022).  If "there is *any* rational reason (even one) to think that Congress is better suited" to resolve the cost-benefit analysis of permitting a damages action to lie, an implied action is precluded.  *Id.* at 1805.  Even claims that closely "parallel" the "circumstances" in *Bivens*, *Passman*, or *Carlson* cannot survive unless a plaintiff "also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law," including by making a showing that there is *zero* rational reason to think Congress is better suited to create policy with respect to a damages remedy than courts.  *Id.* at 1808-09 (stating that the Supreme Court's prior *Bivens* decisions "carr[y] little weight" in determining the availability of a *Bivens* remedy today, where the prior cases predated the Court's "current approach to implied causes of action" and which "diverge[] from the prevailing framework").

The Tenth Circuit echoed *Egbert*'s warning against implying new *Bivens* claims: "The Supreme Court's message could not be clearer—lower courts expand *Bivens* claims at their own peril."  *Silva v. United States*, 45 F.4th 1134, 1136 (10th Cir. 2022); *see also id.* at 1140 (expanding *Bivens* "is impermissible in virtually all circumstances").  The court also emphasized the "key takeaway from *Egbert*" is that "courts may dispose of *Bivens* claims for 'two *independent*

---

[2] Those three cases are *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics*, 403 U.S. 388 (1971) (Fourth Amendment claim against federal agents); *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth Amendment Due Process Clause claim related to gender discrimination); and *Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment claim against prison personnel who failed to provide adequate medical care to inmate, resulting in his death).

reasons:  Congress is better positioned to create remedies in the context considered by the court, and the Government already has provided alternative remedies that protect plaintiffs.'"  *Id.* at *1141 (emphasis in original).  In *Silva*, because the plaintiff had the BOP's administrative remedy program available to him, the Tenth Circuit held that it could not imply a *Bivens* remedy.  *Id.*

Here, Claims 1 and 3-9 cannot be litigated as individual-capacity claims for damages.

**A.     There is no *Bivens* action for First Amendment retaliation (Claims 1 and 6).**

Plaintiff brings two First Amendment retaliation claims against Defendants Turner and Santisteven, respectively (Claims 1 and 6).  *Egbert* resolves these claims: "there is no *Bivens* action for First Amendment retaliation."  142 S. Ct. at 1807.  Claims 1 and 6 should be dismissed.

**B.     There is no *Bivens* remedy for Plaintiff's claims under the Eighth Amendment (Claims 3, 4, 5, 7, 8, and 9).**

The remainder of Plaintiff's *Bivens* claims allege violations of the Eighth Amendment.  ECF No. 75 ¶¶ 222-24.  However, the claims fail because each differs in meaningful ways from those claims recognized by the Supreme Court and therefore presents new contexts, and special factors counsel against creating judicial remedies for these claims.  Additionally, "the BOP Administrative Remedy Program is an adequate 'means through which allegedly unconstitutional actions can be brought to the attention of the BOP and prevented from recurring.'"  *Silva*, 45 F.4th at 1141.  Therefore, no *Bivens* remedy is available, and the claims should be dismissed.

**1.  Plaintiff's claims arise in a new context.**

Plaintiff's claims arise in a new context.  A case presents a new context is if it "different in a meaningful way from previous *Bivens* cases decided by" the Supreme Court.  *Abbasi*, 137 S. Ct. at 1859.  Additionally, "a new context arises when there are 'potential special factors'" that counsel against permitting a damages remedy "that previous *Bivens* cases did not consider," or

when a different constitutional right is at stake.  *Egbert*, 142 S. Ct. at 1803, 1807.  Here, Plaintiff's claims are distinguishable from those for which the Supreme Court implied a remedy, and special factors are present in this case that were not considered by the Supreme Court.

Plaintiff alleges that Defendant Santisteven refused to refer him to the medical staff, altered food intake records, and used excessive force when escorting him to a medical evaluation (Claims 3 and 4), ECF No. 75 ¶¶ 57-58, 66, 127, 133, 136, 142; that Defendant Medrano did not intervene to stop Santisteven's excessive force (Claim 5), *id.* ¶¶ 131, 138, 145; that Defendant Dr. Conroy did not provide adequate medical care, when she determined that medical intervention was unnecessary (Claim 7), *id.* ¶¶ 158-64, 177-78; that Defendant True, the warden, was aware of the various "violations committed against" Plaintiff, but "failed to do any thing," (Claim 8), *id.* ¶¶ 181-88; and that Defendant Seroski, a physician assistant, "caused" injuries when she prescribed him medicine that he requested (Claim 9), *id.* ¶¶ 191-210.

Of the Supreme Court's cases implying *Bivens* remedies, only *Carlson* addressed Eighth Amendment claims, and thus provides the only potential analogous context.  *See Egbert*, 142 S. Ct. at 1807 ("a new context arises when there is a new 'constitutional right at issue'").  The Court must decide whether Plaintiff's claims arise in a context different than that in *Carlson*.

In *Carlson*, a mother brought an action alleging that prison officials caused the death of her inmate son when they were deliberately indifferent to his medical condition following a severe asthmatic attack.  *See Carlson*, 446 U.S. at 16 n.1.  The plaintiff alleged that her son was not given proper medical attention when he returned to prison after being hospitalized for eight days.  *Green v. Carlson*, 581 F.2d 669, 671 (7th Cir. 1978).  Among other things, she alleged that the prison, fully aware of the "inadequacy" of medical facilities and staff: (1) failed to follow the advice of doctors; (2) failed to provide competent medical attention following the asthmatic attack;

(3) unreasonably delayed transfer to an outside medical facility; and (4) permitted a non-licensed nurse to inject the inmate with a drug contraindicated for an asthmatic attack, which made the condition worse.  *Id.*; *Carlson*, 446 U.S. at 16 n.1.

Factually, Plaintiff's claims against the individual Defendants are distinguishable from those in *Carlson*.  Plaintiff does not allege that prison staff failed to follow medical advice or failed to effectuate a needed transfer to a better medical facility, or that the staff gave him medicine that made his condition worse.  Plaintiff does not allege that an unreasonable delay in transferring him to a competent medical facility caused him serious injury.  Allegations of altering food intake documents, using excessive force during an escort to the medical room, failing to stop excessive force during the escort or in the medical room, and failing to supervise prison employees have no meaningful analog in *Carlson*.  Neither do Plaintiff's allegations that a doctor determined that no further intervention was necessary or a medical staff member appropriately prescribed medicine that Plaintiff requested.  The stakes of the decisions made here do not compare in magnitude or urgency to those that resulted in the death in *Carlson*.  *See Archer v. Alms*, No. 20-cv-01247-PAB-KLM, at *8 (D. Colo. Nov. 2, 2022), ECF No. 171 (recommending dismissal of an Eighth Amendment deliberate indifference *Bivens* claim arising out of medical treatment of an inmate's breathing issues, factually distinguishing the claim from the "extreme" circumstances of *Carlson*).

It is also significant that Plaintiff's medical conditions were self-imposed as an act of protest; he had the ability to remediate them unilaterally.  This situation demanded different management and medical judgments from prison officials than managing the prisoner's acute asthma in *Carlson*.  The BOP has separate guidance about how to manage hunger strikes, evidencing that the scenario presents separate administrative, medical, and policy considerations for prison officials and employees than other medical issues.  *See* BOP Program Statement,

P5562.05, *Hunger Strikes* (July 29, 2005), *available at* https://www.bop.gov/policy/progstat/ 5562_005.pdf (last visited November 29, 2022).  Plaintiff's post-hunger-strike medical claim concerns long-term management of non-emergent, lingering physical effects of Plaintiff's voluntary hunger strike, which contrasts with the acute, life-threatening risk to the prisoner's health in *Carlson.  See Carlson*, 446 U.S. at 16 n.1.  Plaintiff's medical care required different policy choices regarding the allocation of medical resources than those in *Carlson*.

This case is further distinguishable from *Carlson* because the *Carlson* court did not defer to "congressional inaction" with respect to a damages remedy against prison employees related to medical care.  *See Egbert*, 142 S. Ct. at 1808 ("Now, though, we defer to 'congressional inaction'").  In this case, there is "legislative action suggesting that Congress does not want a damages remedy" against individual federal officers, because Congress considered prisoner abuse in the context of passing the Prison Litigation Reform Act of 1996 and has been active in prisoners' rights.  *Abbasi*, 137 S. Ct. at 1865.  Congress' decision to "not provide for a standalone damages remedy against federal jailers" suggests "Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment."  *Id.*  Because *Carlson* was decided without the benefit of intervening case law explaining "that the absence of relief 'does not by any means necessarily imply that courts should award money damages,'" a remedy cannot be implied here.  *Egbert*, 142 S. Ct. at 1808 (citing *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)).  This Court should not act where Congress did not.

Additionally, in *Carlson*, the family of the decedent prisoner did not have access to the BOP's administrative remedy program to redress unconstitutional behavior, whereas Plaintiff has such access here.  This distinction "'alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action."  *Egbert*, 142 S. Ct. at 1804.

Finally, the *Carlson* court did not "meaningfully under[take]" the "special-factors inquiry," which, in this case, shows that "the Judiciary is comparatively ill suited to decide whether a damages remedy" against prison officials is appropriate. *Egbert*, 142 S. Ct. at 1805.

As the Supreme Court has observed, even if a case involves the same "right" and "mechanism of injury" as *Carlson* (such as an Eighth Amendment claim alleging the "failure to provide adequate medical treatment"), it can present a new context. *Abbasi*, 137 S. Ct. at 1859 (discussing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001)); *id.* at 1865 (declining to extend *Bivens* despite only "perhaps small" differences between the claim presented and *Carlson*); *Silva*, 45 F.4th at 1137 (stating that an Eighth Amendment excessive force claim "clearly constitutes an expansion of *Bivens*"); *Archer*, *supra*, at *8 (recommendation declining to extend *Bivens* for a deliberate indifference medical claim); *Abdo v. Balsick*, No. 18-cv-01622-KMT, 2019 WL 6726230, at *6 (D. Colo. Dec. 11, 2019) (inmate's claim excessive force, deliberate indifference, and failure to intervene claims were "readily distinguishable" from *Carlson* and thus arose in a new context). Here, Plaintiff's claims present new *Bivens* contexts.

### 2. There are reasons to think that Congress is better suited to fashion a damages remedy.

Extending *Bivens* here also could compromise prison administration. The threat of personal liability could impede the proper functioning of the BOP by causing officials to alter their behavior and judgment to avoid a lawsuit, at the expense of institutional security and the health of inmates. *Abbasi*, 137 S. Ct. at 1863. "Claims against federal officials often create substantial costs, in the form of defense and indemnification," and "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process are significant factors to be considered." *Id.* at 1856. The special context of hunger strikes would make all correctional staff

subject to personal lawsuits, whether for not doing enough or for doing too much.  *See, e.g.*, *Abdulmutallab v. Sessions*, No. 17-cv-02493-RM-KMT, 2019 WL 1064062, at *8 (D. Colo. Mar. 6, 2019) (plaintiff asserting that the BOP should *never* interfere in the plaintiff's hunger strike, either by "force-feeding him or taking any other actions in response").  And, as explained above, Congress opted not to expand damages remedies outside the *Carlson* context in the PLRA.

For Plaintiff's Claims 3, 4, 5, 7, 8, and 9, there are rational reasons to think that Congress "is better suited to 'weigh the costs and benefits of allowing a damages action to proceed'" than courts.  *Egbert*, 142 S. Ct. at 1805.

### 3.   The Government already has provided alternative remedies.

Plaintiff's *Bivens* claims also fail because an adequate remedial process, the BOP Administrative Remedy Program, precludes a damages remedy.  An agency grievance procedure prohibits a *Bivens* remedy, even if it provides the aggrieved party no rights to participation or appeal, or if an individual damages remedy would be more effective at deterring constitutional violations.  *Egbert*, 142 S. Ct. at 1806-07.  Post-*Ebert*, the Tenth Circuit affirmed dismissal of a prisoner's *Bivens* claim against a BOP official for excessive force under the Eighth Amendment, holding that the BOP Administrative Remedy Program qualified as an adequate remedial procedure that foreclosed a *Bivens* claim, without conducting analysis of whether Congress was better suited to create a damages remedy.  *Silva*, 45 F.4th at 1141-42.

This case presents the same issue.  The BOP Administrative Remedy Program allows inmates to "seek formal review of an issue relating to any aspect of his/her own confinement."  28 C.F.R. 542.10(a).  The Court cannot "second-guess" the efficacy of this administrative scheme "by superimposing a *Bivens* remedy."  *Egbert*, 142 S. Ct. at 1807; *see also Malesko*, 534 U.S. at 74 (inmates "have full access to remedial mechanisms established by the BOP").  This alternative

remedial process precludes *Bivens* claims against the Defendants in their individual capacities.[3]

## II.     Defendants are entitled to qualified immunity for Claims 1, 2, 3, 5, 7, 8, and 9.

Government officials are shielded from liability for damages when their conduct does not violate "clearly established" law of which every reasonable officer would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To overcome qualified immunity, a plaintiff bears the heavy burden to show that: (1) each Defendant's *own conduct* violated a constitutional or statutory right, and (2) the right allegedly violated was clearly established at the time of the conduct.  *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017).  Clearly established law must be particularized to the facts of the case with a high degree of specificity.  *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017).  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established,'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015), so "that every 'reasonable official would [have understood] that what he is doing violates that right," with precedent placing the question "beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Here, Plaintiff fails to plead that Defendants violated clearly established law that every reasonable officer would have known.[4]

### A.     Defendant Turner is entitled to qualified immunity on Plaintiff's retaliation claim (Claim 1).

Defendant Turner is entitled to qualified immunity because Plaintiff does not plausibly plead a First Amendment violation.  To state a claim for government retaliation against a plaintiff for exercising his First Amendment rights, the plaintiff must allege: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from

---

[3]  The availability of the BOP's remedy program also would preclude Claims 1 & 6, if First Amendment retaliation claims were cognizable under *Bivens*, which they are not. *See supra* II.A.

[4]  Defendant Santisteven does not move to dismiss Claims 4 or 6 on the grounds of qualified immunity but reserves the right to do so at a later stage of the case.

continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).  The second factor is "objective, rather than subjective ... a trivial or de minimis injury will not" suffice.  *Id.* (citing *Eaton v. Meneley*, 379 F.3d 949, 954-55 (10th Cir. 2004)).  The third factor requires a causal connection between the "retaliatory animus" and the plaintiff's injury.  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury," meaning that the retaliatory conduct "must be a 'but-for' cause" that "would not have been taken absent the retaliatory motive."  *Id.*

Because "[p]risons are unique," the government may restrict prisoners' rights "in ways that would raise grave First Amendment concerns outside the prison context."  *Turner v. Falk*, 632 F. App'x 457, 460 (10th Cir. 2015) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1185, 1187 (10th Cir. 2010)).  In the prison context, "prison restrictions on inmate expression are common. Therefore, to raise a plausible claim, an inmate must allege facts showing that an imposed restriction violated prison regulations or that the restriction was unconstitutional under the circumstances."  *Id.* at 461 (citing *Gee*, 627 F.3d at 1190).

Here, Plaintiff's First Amendment retaliation claim fails because he cannot allege that he suffered an injury that would chill First Amendment activity by a person of ordinary firmness, or that the adverse action was substantially motivated by Plaintiff's protected conduct.  A prisoner does not experience a retaliatory injury when—consistent with nationwide BOP policy—he is denied the use of prohibited VoIP calls.  *See* BOP Program Statement P5264.08, § 8, *supra* n.1; *see Turner*, 632 F. App'x at 460 (requiring a showing that conduct *violated* a BOP policy or

otherwise was unconstitutional).  A person of ordinary firmness would not be deterred from engaging in protected activity merely because he was "deprived" of a privilege to which no prisoner was entitled.  Furthermore, Plaintiff affirmatively alleges that he has not had his right or ability to place phone calls restricted in any meaningful way.  ECF No. 75 ¶ 221 (conceding free telephone access).  Finally, the Program Statement, from 2008, predates Plaintiff's alleged protected activity, and thus Plaintiff fails to plausibly plead that his alleged "injury" was a response to his protected activity.  He fails to allege a First Amendment violation and therefore Defendant Turner is entitled to qualified immunity.

**B.    Defendant Turner is entitled to qualified immunity on Plaintiff's RFRA claim (Claim 2).**

The defense of qualified immunity is available for alleged violations of RFRA.  *Ajaj v. Fed. Bur. of Prisons*, 25 F.4th 805, 817 (10th Cir. 2022).  Here, Plaintiff does not plausibly plead a violation of RFRA.  First, Plaintiff fails to allege that his exercise of religion is substantially burdened.  *See* 42 U.S.C. § 2000bb-1(a)-(b) ("Government shall not substantially burden a person's exercise of religion" unless the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest").  As described above in part II.A, Plaintiff's communication with his family was not disrupted by the blocking three local VoIP phone numbers.  ECF No. 75 ¶ 221 (admitting free phone use).  Without alleging facts showing a substantial burden, he fails to state a RFRA claim.

Second, even absent CARES Act relief, Plaintiff does not allege a substantial burden on his exercise of religion.  He does not allege that his religion requires him to use local VoIP phone numbers that forward to long-distance numbers.  He merely alleges that his religion requires him to maintain close relationships with family "as much as possible."  ECF No. 75 ¶ 34.  But

Plaintiff remains free to use the prison's mail and telephone service to communicate with his family. Defendants are not stopping Plaintiff from communicating with his family "as much as possible"—a relative standard. Plaintiff's incarceration necessarily limits his contact with his family, but those are natural consequences of his criminal convictions, not unjustified, substantial burdens that Defendants have placed on his religious activity.

The alleged burden Plaintiff describes is a mere inconvenience, which is not actionable under RFRA. *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1316 (10th Cir. 2010) ("the substantial burden test requires . . . that the government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice"); *Ajaj v. Fed. Bur. of Prisons*, No. 08-cv-02006-MSK-MJW, 2011 WL 902440, at *6 (D. Colo. Mar. 10, 2011) (lack of videoconferencing visits with family was a "mere 'inconvenience'" to religious exercise). At its core, Plaintiff's argument is that he could afford to make more or longer phone calls to family using local VoIP numbers, which he pleads are half as expensive as regular phone service calls, *without having to sacrifice* his voluntary expenditures from the commissary. ECF No. 75 ¶¶ 10-11. To the extent Plaintiff talks to his family less because he opts to purchase items from the commissary, his budgeting decisions do not give rise to a RFRA violation. Plaintiff's alleged income would allow him to make between four and six 12- to 15-minute phone calls per month using the regular phone service. *Id.* ¶ 10.[5] He does not allege facts showing such level of communication is a substantial burden on his religious beliefs.

Third, and finally, the government has a compelling interest in prohibiting call-forwarding services to maintain both prison and national security. *See, e.g., Hale v. Fed. Bur. of*

---

[5] Prisoner phone calls ordinarily are limited to 15 minutes. *See* BOP Program Statement 5264.08, *supra* n.1, §§ 6.a & 8.f.

*Prisons*, No. 14-cv-00245-MSK-MJW, 2018 WL 1535508, at *11 (D. Colo. Mar. 28, 2018) ("It is beyond dispute that the BOP's need to maintain security and order within BOP facilities is a compelling governmental interest").  Call-forwarding services prevent the government from identifying the recipients of calls, thereby creating a security risk.  The government cannot accept the risk, for example, that convicted terrorists will use these services to communicate with other terrorists.  No alternative short of complete blocking will satisfy this compelling interest.  Plaintiff's RFRA claim fails as a matter of law.

Moreover, on the second prong of the qualified immunity analysis, it is not clearly established by Supreme Court or Tenth Circuit precedent or a "robust consensus of persuasive authority," *see Lewis v. City of Edmond*, 48 F.4th 1193, 1198 (10th Cir. 2022), that an officer violates RFRA by blocking a convicted terrorist's access to local VoIP phone numbers to minimize a security risk, where the use of those numbers is prohibited by BOP policy, *see supra* note 1, and where the prison does not unduly restrict the prisoner's use of the regular phone system, written communication, or in-person visits for the prisoner to communicate with his family.  *See* ECF No. 75 ¶¶ 25-26, 221.  The Court should dismiss the RFRA claim against Defendant Turner.

**C.    Defendants are entitled to qualified immunity for Plaintiff's Eighth Amendment deliberate indifference, failure to intervene, and failure to protect claims (Claims 3, 5, 7, 8, and 9).**

A claim of deliberate indifference to medical needs requires showing: (1) an objectively serious deprivation of medical care; and (2) subjective knowledge, and disregard, of an excessive risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 825, 834, 838-39 (1994).  The objective prong is met if the alleged deprivation of is "'sufficiently serious'" that it amounts to "the denial of the 'minimal civilized measure of life's necessities.'"  *Id.* at 834.  A "medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so

obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"

*Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). A delay in medical care "only

constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in

substantial harm." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001). The substantial

harm requirement may be satisfied by, for example, a "lifelong handicap, permanent loss," *Garrett*

*v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001), or the "unnecessary and wanton infliction of

pain," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

To satisfy the subjective prong of a deliberate indifference claim, "the official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. In addition, the allegations

must plausibly show that the officer's mental state was criminally culpable, "akin to 'recklessness

in the criminal law.'" *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006). This requirement is

intended to "isolate[] those who inflict punishment." *Farmer*, 511 U.S. at 839; *id.* at 837 (stating

that it is not enough that an official should have known about a serious risk; instead, the official

must perceive that risk and deliberately ignore it). A showing of negligent or inappropriate care is

insufficient to plead the subjective prong. *Self*, 439 F.3d at 1233, 1235.

**_Defendant Santisteven_ (Claim 3)**. Plaintiff claims that on April 1 and 10, 2020, he asked

Santisteven to "refer him to the medical," but Santisteven did not. ECF No. 75 ¶¶ 57-58, 103-05.[6]

Plaintiff admits, however, that Santisteven knew Plaintiff was in direct communication with

medical staff about his hunger strike. *Id.* ¶¶ 58, 105. Plaintiff also alleges that on April 1,

---

[6] Plaintiff also makes various other allegations against Defendant Santisteven, but these allegations appear to relate to his other claims against Defendant Santisteven. *See, e.g.*, ECF No. 75 ¶¶ 122-48 (allegations relating to excessive force, not deliberate indifference); *id.* ¶¶ 73, 99-100 (allegations relating to Plaintiff's use of the telephone and the property in his cell).

Santisteven manipulated food in Plaintiff's food tray in a way Plaintiff believed was an attempt to "fabricate" that Plaintiff was eating and refused to remove commissary food items from Plaintiff's cell. *Id.* ¶¶ 60-65, 98-100.  This claim fails for five separate reasons.

*First*, the allegations make clear that Santisteven's conduct did not deprive Plaintiff of medical care.  Plaintiff was seen by medical staff six times throughout his 3-week hunger strike, including around the time of Santisteven's alleged indifference, on April 8, 2020, and April 13, 2020.  *See id.* ¶¶ 82, 108, 110, 123, 157, 167, 169.  The medical staff was aware of Plaintiff's hunger strike and conditions both before and after he spoke with Santisteven.  *Id.* ¶¶ 58, 76, 80, 84-85, 97, 107, 110.  Plaintiff communicated with medical staff directly or through other officers and did not rely on Santisteven to obtain medical care.  *Id.* ¶¶ 48, 51, 58, 75-76, 80, 82, 85, 97, 105, 107-08, 110, 113-14, 118.  Plaintiff also knew how to, and did (on April 3 and April 10, 2020), place sick-call requests to request medical attention.  *Id.* ¶¶ 80, 107.  Santisteven did not deprive Plaintiff of medical attention or prevent him from contacting the medical staff.

*Second*, Plaintiff does not allege that that he has suffered any particular handicap or permanent loss.  Moreover, he fails to allege that Santisteven was the cause of any such injury.  Even if Santisteven had referred Plaintiff to the medical staff immediately upon request, Plaintiff pleads that the medical staff did not think that any medical intervention, aside from Plaintiff stopping his hunger strike, was warranted or would improve Plaintiff's symptoms.  *Id.* ¶¶ 114, 118, 161, 163, 178.  Plaintiff also admits that he refused to resume eating, despite encouragement by Santisteven and the medical staff.  *See, e.g.*, *id.* ¶¶ 102-03, 160-167.  Therefore, Plaintiff fails to plead that he would have (1) received any different treatment, (2) followed medical advice to eat, or (3) experienced different symptoms if Santisteven had acted differently on April 1 or April 10.  Plaintiff did not suffer a cognizable injury caused by Santisteven's conduct.

17

*Third*, Plaintiff also fails to plead that Santisteven disregarded a risk of serious injury or death. *See Rivera v. Long*, No. 19-cv-03608-CMA-NYW, 2021 WL 5917453, at *11 (D. Colo. Dec. 10, 2021), *report & recommendation adopted,* 2022 WL 36133 (D. Colo. Jan. 4, 2022) (prisoner failed to state an Eighth Amendment claim based on his 21-day hunger strike because the allegations of weight loss and a weakened state did not establish a subjective disregard of an objectively serious risk of harm).

*Fourth*, Plaintiff fails to allege "unnecessary [or] wanton" infliction of pain. *See Estelle*, 429 U.S. at 104. The pain Plaintiff felt arose from his choice to stop eating. *See, e.g.*, ECF No. 75 ¶¶ 102-03, 160-167. He does not allege that the pain he experienced was attributable to any delay in care, or that more immediate care would have alleviated his self-inflicted pain, particularly where he continued his hunger strike against medical advice. "While '[p]rison administrators have a right and a duty to step in and force an inmate to take nourishment if a hunger strike has progressed to the point where continuation risks serious injury or death[,] ... if weight loss and temporary discomfort are the only consequences of refusing to eat, then the inmate's choice to go on a hunger strike raises no Eighth Amendment concern." *Anderson v. Colo. Dep't of Corr.*, No. 16-cv-02113-CMA-MJW, 2017 WL 6033681, at *7-8 (D. Colo. Aug. 27, 2017) (quoting *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011)).[7]  Plaintiff does not plead an Eighth Amendment violation against Santisteven.

*Fifth*, and finally, Plaintiff cannot show that it was clearly established that Santisteven's

---

[7] Accepting as true for purposes of this motion that Santisteven told Plaintiff "no one cares whether you eat or die," *id.* ¶¶ 66 & 105, and said "I like killing terrorists," *id.* ¶ 144, expressing a lack of care regarding whether someone lives or dies, while inappropriate, does not rise to the level of a constitutional violation. *See Alvarez v. Gonzales*, 155 F. App'x 393, 396 (10th Cir. 2005) (noting that "verbal threats or harassment do not rise to the level of a constitutional violation unless they create 'terror of instant and unexpected death.'").

conduct violated the Eighth Amendment.  Defendants are aware of no precedent that made it "beyond debate" to every reasonable official in Santisteven's position that his actions violated Plaintiff's constitutional rights.  *See al-Kidd*, 563 U.S. at 741.  Defendants have found no case holding that a prison official violates the Constitution when he refuses to refer a hunger-striking inmate to the medical staff, when the prisoner is already in contact with them; where medical staff is monitoring and making decisions regarding the inmate's care; where the inmate ignores medical advice to eat; and where the officials themselves have no authority over medical treatment.  Thus, Defendant Santisteven is entitled to qualified immunity on Claim 3.

   ***Defendant Medrano*** **(Claim 5).**  "In order to be liable for failure to intervene, the officers must have 'observe[d] or ha[d] reason to know' of a constitutional violation and have had a 'realistic opportunity to intervene.'"  *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015).

   Defendant Medrano is entitled to qualified immunity.  Plaintiff alleges that Medrano failed to intervene to stop excessive force while Defendant Santisteven escorted Plaintiff to the medical room.  Specifically, Plaintiff alleges that Medrano heard Plaintiff complain "politely" to Santisteven that his handcuffs were "too tight" and that he was "in pain."  ECF No. 75 ¶¶ 129, 131.  Plaintiff never repeated the complaint.  *Id.* ¶ 130.  Plaintiff also alleges that Medrano saw Santisteven lift Plaintiff up from a bed in the medical room and throw Plaintiff down on his side.  *Id.* ¶¶ 136, 138.  Plaintiff alleges that he asked Medrano "to replace" Santisteven with another officer for the escort back to Plaintiff's cell, but Medrano declined.  *Id.* ¶ 139.  On the return escort, Plaintiff pleads, in vague and conclusory fashion, that Santisteven used a "lower amount of unnecessary force," but still caused him pain.  *Id.* ¶ 142.

   These allegations are insufficient to plausibly allege that Medrano had "knowledge of a constitutional violation," *Jones*, 809 F.3d at 576, and failed to act.  The facts alleged would not

have put Medrano on notice of an Eighth Amendment violation.  Regarding the allegation that Medrano witnessed Santisteven throw Plaintiff on his side, Plaintiff does not plead that Medrano had a realistic opportunity to intervene to prevent the alleged conduct.  *See Savannah v. Collins*, 547 F. App'x 874, 877 (10th Cir. 2013) (collecting cases where a defendant had no realistic opportunity to prevent quick, unexpected action).  And it is not clearly established that Medrano's alleged conduct violated the Eighth Amendment.  The Court should dismiss Claim 5 against Medrano.

***Defendant Conroy* (Claim 7)**.  Defendant Conroy is entitled to qualified immunity on Claim 7 because Plaintiff has not shown an Eighth Amendment violation or that Dr. Conroy violated any clearly established law.  Plaintiff contends that Dr. Conroy was deliberately indifferent to his medical needs when he "complained to her of his ongoing substantive medical conditions" on April 15, 2020, and she responded that Plaintiff should "eat now before's too late" but that she would "never" intervene in his hunger strike.  ECF No. 75 ¶¶ 160-63.

Plaintiff does not identify what treatment he should have received from Dr. Conroy.  The BOP Program Statement governing hunger strikes provides two options for treating a hunger-striking inmate at serious, imminent risk of harm: (1) transfer to an outside medical institution; or (2) force-feeding.[8]  Plaintiff does not allege that he should have been transferred to an outside treatment center or that he should have been force-fed.  In fact, he admits that, when a nurse suggested that he might "recommend" force-feeding, Plaintiff rebuffed the suggestion, stating that

---

[8] *See* BOP Program Statement 5562.05, *supra* at 7-8, § 8(d) (BOP staff may transfer a hunger-striking inmate to outside care when medical staff "consider it medically mandatory"), and § 10(a) ("When, as a result of inadequate intake or abnormal output, a physician determines that the inmate's life or health will be threatened if treatment is not initiated immediately, the physician shall give consideration to involuntary medical treatment of the inmate."). The Program Statement also provides that staff "shall make reasonable efforts to convince the inmate to voluntarily accept treatment." *Id.* § 10(b).

he "preferred to remain in my cell." ECF No. 75 ¶ 141. What Plaintiff sought was more frequent attention from medical staff, which is not cognizable as an Eighth Amendment claim.

Plaintiff's allegations do not establish deliberate indifference. He has not shown that Dr. Conroy's decision not to force-feed him caused him to suffer substantial harm. He has not plausibly alleged that Dr. Conroy, who admittedly was familiar with Plaintiff's medical history and previous hunger strikes, *see id.* ¶ 158, believed that Plaintiff was at risk of substantial harm and ignored that risk and deprived him of treatment. At most, he alleges he believed he should have been given more, unspecified treatment, but "disagreement[s] in medical judgment" do not constitute deliberate indifference. *See Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997); *Scott v. Gibson*, 37 F. App'x 422, 423 (10th Cir. 2002) ("Eighth Amendment assertions amounted only to a difference of opinion as to the need for medical and dental treatment or the adequacy of any treatment and, thus, Defendants' acts did not constitute deliberate indifference").

Plaintiff cannot show a clearly established constitutional violation by Dr. Conroy. Decisions regarding how to monitor a hunger-striking inmate are matters of medical judgment, which vary from inmate to inmate. *See, e.g.* BOP Program Statement 5562.05, *supra* at 7-8, § 12 ("Medical Judgment"). Defendants have found no authority particularized to the facts of this case holding that it is an Eighth Amendment violation to decline to force-feed an inmate on a temporary hunger strike where that inmate refuses such treatment, where his condition was not life-threatening, and no substantial harm resulted from the exercise of medical judgment.

***Warden True* (Claim 8)***. The individual-capacity claim against Warden True for "failure to supervise and protect" should be dismissed on qualified immunity grounds. A failure-to-protect claim is evaluated under same "deliberate indifference" standards set forth above: only "extreme deprivations" taken with a sufficiently culpable mental state violate the Eighth Amendment.

*Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992).  In addition, "to state a claim for failure to supervise … , a plaintiff must show that a constitutional deprivation occurred and 'an affirmative link ... between the [constitutional] deprivation and [ ] the supervisor's ... exercise of control or direction, or his failure to supervise.'"  *Turner v. Schultz*, 130 F. Supp. 2d 1216, 1226 (D. Colo. 2001) (quoting *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988)).

Here, Plaintiff alleges that he sent "requests" to Warden True complaining about the alleged wrongful conduct of BOP staff members, but that Warden True did not "protect" him from the improper conduct.  ECF No. 75 ¶¶ 182-89.  Plaintiff further alleges that the Warden "agreed" with the "force" used against him.  *Id.* ¶ 188.  Plaintiff does not plead what steps the Warden should have, or could have, taken to ensure his "health and safety."  *Id.* ¶ 187.

These allegations are insufficient to establish a constitutional violation because they do not show that the Warden personally participated in any violation of the Eighth Amendment, let alone any "affirmative link" between the Warden and the alleged violations.  The "simple awareness of a prisoner's complaints of health concerns does not constitute personal participation in the deprivation of a constitutional right."  *Coppage v. Hagens*, No. 15-cv-02527-GPG, 2016 WL 277772, at *2 (D. Colo. Jan. 22, 2016); *Davis v. Ark. Valley Corr. Facility*, 99 F. App'x. 838, 843 (10th Cir. 2004) (copying the warden on correspondence outlining complaints about medical care, without more, was insufficient to demonstrate the warden's personal participation in a constitutional violation); *Plummer v. Daniels*, No. 13-cv-00440-BNB, 2013 WL 1444544, at *2 (D. Colo. April 9, 2013) (complaints to warden about alleged inadequate medical treatment not a sufficient basis to impose liability).  Moreover, it is not clearly established that the Warden's alleged conduct violated the constitution.

**_Defendant Seroski_ (Claim 9)**.  Defendant Seroski is entitled to qualified immunity.

Plaintiff alleges that Seroski, a physician assistant, examined him twice, on November 18, 2020, and February 23, 2021—well after his hunger strike ended in April 2020.  ECF No. 75 ¶¶ 200, 206.  Both times, Plaintiff complained that his prescription of hydrochlorothiazide, originally ordered by non-party Dr. Oba, to address swelling in Plaintiff's legs, had run out.  *Id.* ¶¶ 194-99, 206.  Both times, Seroski wrote prescriptions for Plaintiff.  *Id.* ¶ 203 ("Saroski [sic] told me that she'll immediately issue me at least 6-months['] worth of medication"), ¶ 206 ("Saroski [sic] came to see me and said she will get me one year worth of medication and compression socks").  Plaintiff complains that he did not receive the medication immediately after the first visit.  He alleges that he received a one-month supply three weeks later, on December 10, 2020.  *Id.* ¶ 204.  Sixteen days *after* his medication allegedly ran out again, Plaintiff placed a sick call to refill the prescription on January 26, 2021.  *Id.* ¶ 206.  When Seroski saw him, she again prescribed the medicine for him.  *Id.* ¶¶ 206, 208.  Plaintiff does not allege a delay in obtaining the medicine after his second visit with Seroski and acknowledges that he was able to control his condition with medicine, despite temporary gaps in his supply.  *Id.* ¶ 208.

Plaintiff does not plausibly allege an Eighth Amendment violation.  Far from deliberately ignoring a perceived risk of substantial harm or intending to inflict punishment on Plaintiff, Seroski wrote appropriate prescriptions for medications that Plaintiff requested.  *Id.* ¶¶ 203, 206, 208.  Additionally, Plaintiff does not plausibly allege that Seroski was somehow responsible for any delay in examining him or filling his prescription.  These allegations do not state a plausible claim of an Eighth Amendment violation against Seroski.  *See Self v. Crum*, 439 F.3d 1227, 1232-33 (10th Cir. 2006) ("where a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law").

Further, it is not clearly established that responding issuing appropriate prescriptions, even in amounts smaller than Plaintiff desired, violates the Constitution.  Seroski is entitled to qualified immunity.

**III.     Plaintiff's First Amendment retaliation claim is barred by the statute of limitations (Claim 1).**

In the Second Amended Complaint, Plaintiff added a new defendant, Defendant Turner, and alleged for the first time that she retaliated against him in violation of the First Amendment. ECF No. 36 ¶¶ 1-31.  Plaintiff alleges that the retaliation occurred on March 12, 2020, when he received a "telephone list change notice" indicating the removal of the three local VoIP phone numbers from his approved list.  ECF No. 75 ¶ 24.  On March 27, 2020, Plaintiff tried calling his brother using the local number and discovered it was blocked.  *Id.* ¶ 31.  The First Amendment retaliation *Bivens* claim should be dismissed because it is barred by Colorado's statute of limitations.

A *Bivens* claim is subject to the general personal injury statute of limitations of the state where the claim arose.  *Van Tu v. Koster*, 364 F.3d 1196, 1198 (10th Cir. 2004).  In Colorado, the general personal injury statute of limitations is two years.  Colo. Rev. Stat. § 13-80-102(1)(a); *Indus. Constructors Corp. v. U.S. Bur. of Reclamation*, 15 F.3d 963, 968 n.4 (10th Cir. 1994).  A First Amendment retaliation claim accrues when the plaintiff "knew or had reason to know of the alleged retaliatory" conduct.  *Mata v. Anderson*, 635 F.3d 1250, 1252-53 (10th Cir. 2011); *see also Van Tu*, 364 F.3d at 1199.  Here, Plaintiff's *Bivens* claim accrued on March 12, 2020, when he received notice of the blocked numbers, or certainly no later than March 27, 2020, when he tried calling a blocked number.  ECF No. 75 ¶¶ 6, 24, 31.  Plaintiff did not include any allegations about Defendant Turner or his phone privileges in the original complaint and did not move to amend the

24

complaint, or file the Amended Complaint, until June 2022, more than two years later.  ECF Nos.

30 & 36.  The Court should dismiss Claim 1 as time-barred.

## IV.   The Court lacks jurisdiction over Plaintiff's RFRA claim and official-capacity constitutional claims (Claims 1 through 8).

Plaintiff seeks injunctive relief with respect to his phone privileges and asks the Court to

enter an injunction requiring Defendants to "adhere with the law and existing BOP-regulations at

all time[s] . . . and especially at the time I'm on Hunger Strike."  ECF No. 75 at 30 § G(A).  But

Plaintiff lacks any injury related to his phone calls, and his RFRA claim is not ripe.  With respect

to Plaintiff's other claims, he lacks Article III standing to seek prospective relief, because he

lacks an actual or imminent future injury.  The Court should dismiss claims 1 through 8 for lack

of standing.

To establish Article III standing, an injury must be "concrete, particularized, and actual or

imminent."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  A plaintiff seeking

prospective relief must show he is "'immediately in danger of sustaining some direct injury' as

the result of the challenged official conduct, and the injury or threat of injury must be both 'real

and immediate,' not 'conjectural' or 'hypothetical.'"  *City of Los Angeles v. Lyons*, 461 U.S. 95,

102 (1983).  "[W]ithout any description of concrete plans, or indeed even any specification of

*when* the some day will be," there can be no "finding of the 'actual or imminent' injury that our

cases require."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).   A plaintiff must

demonstrate standing separately for each claim and "each form of relief sought."

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

"Standing and ripeness are closely related in that each focuses on whether the harm

asserted has matured sufficiently to warrant judicial intervention."  *Peck v. McCann*, 43 F.4th

1116, 1133 (10th Cir. 2022) (citing *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1097 (10th Cir. 2006)).  But unlike standing, ripeness issues focus "not on whether the plaintiff was in fact harmed, but rather whether the harm asserted has matured sufficiently to warrant judicial intervention."  *Id.* (citing *Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004)).

A.    **Plaintiff lacks standing to assert his telephone claims (Claims 1 and 2).**

The Court lacks jurisdiction over Plaintiff's First Amendment retaliation and RFRA claims related to his phone privileges, because: (1) Plaintiff does not allege an injury to establish standing; and (2) the RFRA claim is not ripe.  Plaintiff alleges that Defendant Turner retaliated against him and substantially burdened his religious practice under RFRA when she blocked Plaintiff's ability to communicate with his family using VoIP phone numbers.  ECF No. 75 ¶¶ 14, 17, 33-42.

However, Plaintiff's factual allegations do not support that he has been injured or that his religious practice has been substantially burdened.  Plaintiff admits that he continues to call his family and acknowledges that, under the CARES Act, calls using the regular telephone service are now "free."  *Id.* ¶¶ 119-20, 221 ("Currently and since 2020, April, phones calls are free . . . .").  The CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(a)(2) & (c)(1) (Mar. 27, 2020), provides that inmates may use video teleconferencing and telephone calls free of charge during the "covered emergency period," defined as 30 days after the President's declared national emergency with respect to COVID-19 has ended.  Accordingly, the removal of three VoIP numbers has not injured Plaintiff or substantially inhibited Plaintiff's religious activity.  ECF No. 75 ¶¶ 119-20, 221.  *See Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*, 326 F. Supp. 2d 1140, 1152 (E.D. Cal. 2003), *aff'd*, 456 F.3d 978 (9th Cir. 2006) ("To meet the 'substantial burden' standard, the governmental conduct being challenged must *actually inhibit* religious activity in a concrete way").

In fact, Plaintiff has had 166 phone conversations with his family in Tanzania since March 2020 and exchanged at least 35 letters.  Exhibit 2, Declaration of D. Lazariuk, ¶¶ 5-6 & Attach. A.[9]  In the absence of an actual or imminent injury inhibiting his religious activity, Plaintiff lacks standing to assert his retaliation or RFRA claims, and his RFRA claim is not ripe.

Because Plaintiff fails to allege a current or imminent injury based on the blocking of VoIP phone numbers, and because his claim is not ripe, and he lacks Article III standing.  Claims 1 and 2 should be dismissed for lack of jurisdiction.

### B.    Plaintiff lacks standing to assert his official capacity claims related to his hunger strike (Claims 3 through 8).

Plaintiff alleges that he experienced unlawful treatment during a hunger strike that occurred more than two years ago.  *See* ECF No. 75 ¶¶ 31, 172.  He speculates that he may hunger strike again at some unspecified point, at which point BOP staff might mistreat him.  His speculation is insufficient to establish standing or support his request for injunctive relief.  Even if Plaintiff hunger strikes again, he has not plausibly alleged facts showing that he will receive the same treatment.  He does not, for example, allege that his treatment was due to any ADX policy; in fact, he alleges his experience during the 2020 hunger strike was anomalous.  *See id.* ¶¶ 53, 57, 67, 73, 100, 132, 174.  His official-capacity claims related to his hunger strike fall short of showing a certain impending future injury and are not ripe.  *See Abdulmutallab*, 2019 WL 4463284, at *2, *4-5 (dismissing hunger-strike related claims for lack of standing or as moot); *see also Abdulmutallab*, 2019 WL 1064062, at *8-9 (recommending dismissal for lack of standing).  An allegation that the BOP mistreated or retaliated against Plaintiff more than two

---

[9]  When considering a Rule 12(b)(1) motion, a court may review evidence outside of the pleadings.  *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1255 (10th Cir. 2001).  Defendants offer Exhibit 2 only in connection with the Rule 12(b)(1) jurisdictional argument.

years ago is insufficient to establish a certainly impending future injury necessary for standing to obtain prospective relief.  Claims 3 through 8 should be dismissed.[10]

**V.      Plaintiff's official-capacity claims should be dismissed for failure to state a claim (Claims 1, 2, 3, 5, 7, 8, and 9).**

For the reasons set forth in part II.A, B, and C, Plaintiff fails to plead a First Amendment violation, a RFRA violation, or Eighth Amendment violations for deliberate indifference, failure to intervene, or failure to protect or supervise.  Claims 1, 2, 3, 5, 7, 8, and 9 should be dismissed for failure to state a claim.

**VI.     Plaintiff's negligent supervision claims should be dismissed (Claims 12 and 13).**

Plaintiff alleges that Defendants Medrano and True failed to "properly supervise" staff. ECF No. 75 ¶¶ 217-18.  He asserts that Medrano's failure to supervise Santisteven caused Plaintiff's injury from Santisteven's alleged excessive force.  *Id.* ¶¶ 122-48, 217.  He asserts that True is liable for failing to supervise Santisteven, Medrano, and Defendant Conroy.  *Id.* ¶ 218. Plaintiff brings these claims under the FTCA.  The Court should dismiss them both.

***Failure to state a claim.***  Plaintiff fails to state a claim for negligent supervision.  To establish a claim based on negligence, the plaintiff must show: (1) the existence of a legal duty to the plaintiff; (2) breach of that duty; and (3) harm resulting from the breach.  *Keller v. Koca*, 111 P.3d 445, 447 (Colo. 2005).  To prove negligent supervision, the plaintiff must prove that the employer "has a duty to prevent an unreasonable risk of harm to third persons to whom the employer knows or should have known that the employee would cause harm."  *Id.* at 448.  Thus, Plaintiff must plead facts showing that Defendant Medrano knew or should have known that

---

[10]  In the alternative, Plaintiff seeks declaratory relief.  ECF No. 75 at 30.  Declaratory judgment claims "for past conduct, as asserted against a federal official in her or her official capacity, are barred by sovereign immunity."  *Mostafa v. Barr*, No. 20-cv-00694-PAB-NYW, 2021 WL 330167, at *9 (D. Colo. Jan. 30, 2021).

Santisteven (or, in the case of True, that Santisteven, Medrano, or Conroy) posed an unreasonable risk of harm to him.

Plaintiff fails to plead negligent supervision.  ECF No. 75 ¶¶ 217-18.  Plaintiff does not allege facts that Medrano disregarded or should have been aware of an unreasonable risk that Santisteven would be violent toward Plaintiff, aside from referencing allegations that Medrano was present for the alleged excessive force.  To the contrary, Plaintiff alleges that prior to his hunger strike, he "had no complaint against" Santisteven.  *Id.* ¶ 151.  Likewise, Plaintiff does not plead facts that plausibly suggest that True was or should have been aware of an unreasonable risk that Santisteven, Medrano, or Defendant Conroy posed to Plaintiff.  Plaintiff asserts that True was aware of Medrano's and Santisteven's "violent [propensity]," *id.* ¶ 218, but does not allege supporting facts.  Plaintiff fails to state a claim for negligent supervision.

***Discretionary function.***  In enacting the FTCA, Congress declined to waive sovereign immunity for acts or omissions "based upon the exercise or performance or the failure to exercise or perform a discretionary function[.]"  28 U.S.C. § 2680(a).  Claims within this exception are barred regardless of whether the conduct "was a matter of deliberate choice, or mere oversight," *Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir. 1993), even if there was negligence, *Elder v. United States*, 312 F.3d 1172, 1184 (10th Cir. 2002).

A two-prong test governs this exception.  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  First, courts consider whether the precise conduct at issue "was 'discretionary,' meaning whether it was 'a matter of judgment or choice.'"  *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008).  "Conduct is not discretionary if 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'"  *Id.*  The Tenth Circuit requires that "the prescribed course of conduct be specific and mandatory."  *Aragon v. United*

*States*, 146 F.3d 819, 823 (10th Cir. 1998). "[I]f the employee's conduct involves 'a matter of choice' or judgment, then the action is discretionary." *Id.* Under the second prong, the court asks whether the challenged action or decision is one requiring the exercise of judgment based on considerations of public policy. *Id.* "In particular, discretionary decisions 'grounded in the social, economic, or political goals of the [governing] statute and regulations are protected.'" *Ball v. United States*, 967 F.3d 1072, 1076 (10th Cir. 2020).

Courts routinely conclude that claims that challenge the government's training and/or supervision are barred by the discretionary function exception. *See e.g., Steele v. United States*, No. 09-cv-01557-CMA-CBS, 2010 WL 2501200, at *4 (D. Colo. June 15, 2010) (holding "claims based on failures to train, supervise or staff the USP are barred by the FCTA's discretionary function exception"). As these cases explain,[11] staff supervision involves policy judgment.

Plaintiff contends that 18 U.S.C. § 4042 "excludes any discretion." ECF No. 75 ¶ 218. But that statue merely enumerates the duties of the BOP, not how Defendants Medrano or True should have acted in the situations alleged. It is Plaintiff's burden to identify a federal statute, regulation, or policy that specifically dictates how the BOP was required to supervise its staff members. *See Sydnes v. United States*, 523 F.3d 1179, 1185 (10th Cir. 2008) (holding that the plaintiff bears the "burden under our case law to present evidence of a discretion-constraining

---

[11] *See also Snyder v. United States*, 590 F. App'x 505, 510 (6th Cir. 2014) ("hiring, supervision, training, and retention require policy judgments—the type that Congress intended to shield from tort liability"); *Suter v. United States*, 441 F.3d 306, 312 n.6 (4th Cir. 2006) ("Courts have repeatedly held that government employers' hiring and supervisory decisions are discretionary functions."); *Alinsky v. United States*, 415 F.3d 639, 648 (7th Cir. 2005) (the "discretionary function exemption protects the government from liability for claims premised on the lack of training, oversight, or qualifications"); *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) ("decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield.").

regulation or policy").  Plaintiff does not identify any such authority, nor could he.

Likewise, Plaintiff fails to demonstrate that the BOP's decisions regarding staff supervision—decisions traditionally based on budgetary, public policy, staffing, and experiential considerations—do not entail any weighing of policy considerations.  Training and supervision at the BOP necessarily involve weighing policy considerations in determining how to best utilize limited agency resources.  Supervision decisions involve the kind of conduct that "categorically" can be based on policy concerns.  *Sydnes*, 523 F.3d at 1185.  Plaintiff's negligent supervision claims fall within the discretionary function exception and should be dismissed.

## CONCLUSION

Defendants respectfully request dismissal Claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 12, and 13.[12]

Dated: November 29, 2022.  COLE FINEGAN
            United States Attorney
            *s/ Thomas A. Isler*
            Thomas A. Isler, Assistant U.S. Attorney
            United States Attorney's Office
            1801 California Street, Ste. 1600
            Denver, CO 80202
            Tel. (303) 454-0336; Fax (303) 454-0411
            thomas.isler@usdoj.gov
            *Counsel for Defendants*

---

[12] Once this motion is decided, Defendants will respond to any surviving claims within 14 days after notice of the Court's decision.  *See* Fed. R. Civ. P. 12(a)(4).

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2022, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system and directed personnel in the United States Attorney's

Office to serve the foregoing document on the following non-CM/ECF participant by U.S. mail:

> Khalfan Khamis Mohamed
> #44623-054
> Florence Admax
> United States Penitentiary
> Inmate Mail/Parcels
> P.O. Box 8500
> Florence, CO 81226
> Pro Se Plaintiff

> *s/ Thomas A. Isler*
> Thomas A. Isler
> U.S. Attorney's Office