IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21–cv–02676–NYW–MDB

KHALFAN KHAMIS MOHAMED,

      Plaintiff,

v.

SANTISTEVEN, Officer, in his individual and official capacities,
MEDRANO, Lieutenant, in his individual and official capacities,
CONROY, Doctor, in her individual and official capacities,
TRUE, Warden, in his individual and official capacities,
SEROSKI, Physician Assistant, in her individual capacity,
TURNER, Officer, in her individual and official capacities, and
UNITED STATES OF AMERICA,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Maritza Dominguez Braswell**

      Pro se Plaintiff Khalfan Mohamed is a Muslim inmate at the United States Penitentiary

Administrative Maximum Facility (ADX). He filed this thirteen-count lawsuit under *Bivens v.*

*Six Unknown Named Agents of Federal Bureau of Narcotics*, the Religious Freedom Restoration

Act ("RFRA"), and the Federal Tort Claims Act ("FTCA"), principally alleging two guards

retaliated against him for filing administrative grievances and also that ADX staff were

deliberately indifferent to his medical needs. (*See generally* Second Amended Complaint

["SAC"], Doc. No. 75.) Defendants move to dismiss eleven of Plaintiff's thirteen claims for

failure to state a claim; they also submit Plaintiff lacks standing to bring several of those eleven

claims. (*See* ["Motion"], Doc. No. 81.) Plaintiff responded, (["Response"], Doc. No. 91),

Defendants replied, (["Reply"], Doc. No. 94), and Plaintiff filed a Surreply, (["Surreply"], Doc.

No. 100). Having considered Plaintiff's allegations, the parties' positions, and relevant legal

authority, the Court respectfully **recommends granting in part and denying in part**

Defendants' Motion.

**SUMMARY FOR PRO SE PLAINTIFF**

The Court recommends denying Defendant's Motion to Dismiss with respect to your

RFRA claim and your negligent supervision claims under the FTCA. This means that if the

presiding judge adopts this recommendation, these claims will move forward to the next phase of

litigation.

However, the Court recommends dismissal of the official capacity claims seeking

injunctive relief because you do not have standing to bring those claims. Specifically, the

injunction you request is too broad and not likely to prevent or redress any ongoing injuries. The

Court also recommends dismissal of all claims filed pursuant to *Bivens v. Six Unknown Named*

*Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), because the U.S. Supreme

Court case of *Egbert v. Boule*, 142 S. Ct. 1793 (2022), has limited the instances in which a

*Bivens* remedy is available.

If you disagree with this recommendation you can object within fourteen (14) days. This

is only a high-level summary of the case. Please be sure to read the recommendation in its

entirety.

**BACKGROUND**

Plaintiff Khalfan Mohamed alleges ADX staff violated his rights before, during, and after his 2020 hunger strike. (*See generally* Doc. No. 75.) Specifically, Plaintiff alleges Correctional Officer Turner wrongfully deprived him of four phone calls over a two-month span in late 2019. (*See id.* at ¶¶ 2–5, 33.) In December 2019, Plaintiff filed an administrative grievance in connection with that alleged deprivation. (*Id.* at ¶ 5.) When Officer Turner learned of Plaintiff's administrative grievance, she allegedly told him she was going to "teach him a lesson" (*id.* at ¶ 6), which she did (*see, e.g.*, *id.* at ¶¶ 7, 14, 17 (alleging Officer Turner retaliated by removing from Plaintiff's approved call list the Voice over Internet Protocol (VoIP) numbers Plaintiff uses to contact his mother, brother, and sister).)[1] Plaintiff contends that he twice pleaded with Warden True to intervene (*id.* at ¶¶ 19, 23), but the phone numbers were officially removed from Plaintiff's approved call list in late February 2020. (*Id.* at ¶¶ 24, 31.) Plaintiff alleges this was a difficult loss because his Muslim faith "requires [him] to keep and maintain close healthy relationships" with his family, all of whom live in East Africa and cannot afford to visit him in the United States. (*Id.* at ¶¶ 33–35, 38, 42.) The loss was also difficult because phone calls are "the single means" that connect him and his family. (*See id.* at ¶¶ 10, 36–39 (explaining that Plaintiff has a hard time sending and receiving mail at ADX and cannot afford the traditional, non-VoIP phone service).)

---

[1] Defendants ask the Court to take judicial notice of "longstanding BOP Policy," which they submit forbids the "[u]se of VoIP phone numbers or call forwarding systems." (Doc. No. 81 at 2 n.1 (citing BOP Program Statement). *Contra* Doc. No. 75 at ¶¶ 5, 8, 13, 16–17, 28–29, 40 (alleging ADX and other federal prisons allow VoIP calls in practice).) The Court takes judicial notice of the BOP Policy only "to show [its] contents, not to prove the truth of the matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Plaintiff—who has filed hundreds of administrative grievances during his more than twenty years at ADX, all of which have been denied—felt he had no choice but to initiate a hunger strike. (*See id.* at ¶¶ 46–47.) He did so on March 29, 2020. (*Id.* at ¶¶ 31, 45–47.) Plaintiff alleges that as an "experienced hunger striker" (*id.* at ¶ 63), he was familiar with federal guidelines for the medical and administrative management of inmates who undertake hunger strikes. (*See* id. at ¶¶ 49, 53 (discussing 28 C.F.R. §§ 549.60–549.66, which instructs that "[i]t is the responsibility of the Bureau of Prisons to monitor the health and welfare of individual [hunger-striking] inmates, and to ensure that procedures are pursued to preserve life").) Plaintiff thus put a wide range of ADX staff on written and verbal notice of his intent to begin his hunger strike, "want[ing] and expect[ing] that [he would] be provided with all appropriate medical attention and treatments in accordance [with] the BOP's regulations." (*Id.* at ¶¶ 48–49, 51.)

Plaintiff alleges ADX staff did not follow those regulations. Instead, for example, they waited more than two weeks after Plaintiff began his hunger strike to conduct his first medical assessment. (*See id.* at ¶ 110.) *Contra* 28 C.F.R. §§ 549.61–549.62 (directing staff to refer a hunger-striking inmate to medical or mental health staff for evaluation and possible treatment, typically within 72 hours of start of hunger strike). Staff also allegedly mocked Plaintiff's hunger strike. (*See, e.g.*, Doc. No. 75 at ¶¶ 161–63, 179.) They ignored Plaintiff's many signs of illness and his many pleas to see a doctor. (*See, e.g.*, *id.* at ¶¶ 57, 82–87 (alleging nurse witnessed Plaintiff's falling over and declined to conduct medical assessment despite an officer's protesting "this man is dying").) And they denied Plaintiff access to the phones because he was hunger striking. (*Id.* at ¶ 73.)

Plaintiff alleges that Officer Santisteven's conduct was particularly egregious. For instance, Officer Santisteven allegedly manipulated Plaintiff's food trays to make it look like Plaintiff was eating (*id.* at ¶¶ 60–62, 95), with the goal of preventing Plaintiff from receiving medical care. (*Id.* at ¶¶ 61, 65, 95, 117.) Additionally, Officer Santisteven allegedly verbally abused Plaintiff. (*See, e.g.*, *id.* at ¶¶ 58, 66 (telling Plaintiff "no one cares about your life"—"eat or die"), 69–70, 143–44 (calling Plaintiff a "dirty Muslim" and suggesting he was going to kill Plaintiff, "like killing terrorists").) Plaintiff alleges Officer Santisteven physically abused him as well. (*See, e.g.*, *id.* at ¶¶ 128, 133, 136, 142, 215–16.) On an April 15 trip to the medical room, Plaintiff stripped down to his underwear to show the medical staff how much weight he had lost and to show that Officer Santisteven was fabricating his food-intake records. (*Id.* at ¶¶ 122–24.) Plaintiff alleges that a short time later, Officer Santisteven lifted Plaintiff—who was fully restrained, had not eaten in over two weeks, and had trouble standing on his own—in the air and then slammed him onto his side. (*Id.* at ¶¶ 136–37, 216.)

According to Plaintiff, several staff members observed Officer Santisteven's conduct in the medical room (*id.* at ¶ 137), but only one nurse attempted to intervene. (*Id.* at ¶ 138 (nurse's telling Officer Santisteven his violence was "unnecessary").) And, despite witnessing Officer Santisteven's violent acts, Lieutenant Medrano ignored Plaintiff's plea to have someone other than Officer Santisteven escort him from the medical room to his cell. (*Id.* at ¶¶ 131, 137–39, 145.) Plaintiff allegedly thrice pleaded with Warden True to protect him from ADX staff, and twice reported that Officer Santisteven and Lieutenant Medrano were fabricating his food-intake records, but Warden True never intervened. (*See id.* at ¶¶ 49, 51, 71, 106, 183–84, 218.)

Plaintiff ended his 22-day hunger strike on April 20, 2020. (*Id.* at ¶ 172.) At that point, he had lost more than 30 pounds (from 148 pounds to 114 pounds at one point). (*See id.* at ¶¶ 122, 140, 169–71.) He also alleges various injuries, some of which still affect him today. (*See id.* at ¶¶ 52, 72, 81, 93, 96, 101, 109, 113, 119, 146–48, 173–76, 191, 197–99, 210–14.) Plaintiff claims he has continued to receive insufficient medical treatment since ending his hunger strike. (*See id.* at ¶¶ 190–209.) Plaintiff also claims he has good reason to believe ADX staff were "motivated by evil" and that they intended to kill him or allow him to die. (*See, e.g.*, *id.* at ¶¶ 58–62, 65, 94–95, 117.)

Plaintiff filed this thirteen-count lawsuit in September 2021. (*See* ["Complaint"], Doc. No. 1; *see also generally* Doc. No. 75.) Broadly, Plaintiff's claims can be grouped into three categories. First, Plaintiff brings one claim against Officer Turner alleging the removal of phone numbers from Plaintiff's approved call list violated his rights under the Religious Freedom Restoration Act (claim 2).[2] (*See* Doc. No. 75 at ¶¶ 1–42.) Second, Plaintiff brings seven *Bivens* claims (claims 3–9) against five members of the ADX staff alleging violations of his First and Eighth Amendment rights. (*See id.* at ¶¶ 43–214.) Finally, Plaintiff brings four claims against the United States under the FTCA (claims 10–13) for battery and negligent supervision. (*See id.* at ¶¶ 215–18.) Plaintiff seeks compensatory and punitive damages against the individual Defendants and an injunction ordering Defendants to comply with the law and BOP regulations. (*Id.* at 30.)

---

[2] Plaintiff also brought a claim against Officer Turner for First Amendment retaliation (claim 1). (*See* Doc. No. 75 at ¶¶ 1–31.) Plaintiff has since withdrawn that claim. (*See* Doc. No. 91 at 3 (explaining withdrawal due to statute of limitations).)

Defendants move to dismiss all but two of Plaintiff's remaining claims under Rule 12(b)(1) and 12(b)(6), leaving only Plaintiff's battery claims under the FTCA unchallenged (claims 10 & 11). (*See generally* Doc. No. 81.)[3]

## LEGAL STANDARD

### I.    Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) presents a threshold challenge to the court's jurisdiction. *See* U.S. Const. Art. III, § 2 (extending the "judicial Power" of the United States only to "Cases" and "Controversies"). Under Rule 12(b)(1), a party may move to dismiss an action or claim when the court lacks subject-matter jurisdiction. A federal court lacks such jurisdiction if the plaintiff does not establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff must establish each element of standing "in the same way as any other matter on which [he] bears the burden of proof." *Bennett v. Spear*, 520 U.S. 154, 167–68 (1997). At the motion to dismiss stage, a plaintiff must plausibly allege he has suffered a cognizable injury fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits. *See Petrella v. Brownback*, 697 F.3d 1285, 1295 (10th Cir. 2012) (citing *Lujan*, 504 U.S. at 560–61).

Generally, a Rule 12(b)(1) challenge to subject matter jurisdiction can take two forms:

First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial

---

[3] Plaintiff also filed a motion asking the Court to exclude: (1) Defendants' new or modified arguments in their most recent motion to dismiss; and (2) the declaration attached to Defendants' motion, in part because it is not proper at this stage of the proceedings. (*See* Motion to Exclude, Doc. No. 90.) The Court recommends **declining** Plaintiff's first request, but **granting** Plaintiff's second request, as explained below.

attack on the complaint, a district court must accept the allegations in the complaint as true.

Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995) (citations omitted).

However, "a court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case." *Id.* at 1003 (citations omitted). "The jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case." *Id.* (citation omitted). But "the focus of the inquiry is not merely on whether the merits and the jurisdictional issue arise under the same statute. Rather, the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Sizova v. Nat'l. Inst. of Standards & Tech.*, 282 F.3d 1320, 1324 (10th Cir. 2002) (citation omitted).

## II.    Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard

does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint in the light most favorable to the plaintiff, *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).

As noted, Plaintiff is proceeding pro se. The court thus "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Still, although a pro se complaint is generally entitled to liberal construction, the plaintiff's pro se status does not entitle him to an application of different rules. *Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002). A court may not assume that a plaintiff can prove facts that have not been alleged or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (stating that a court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (explaining that the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues").

**ANALYSIS**

As noted, Defendants move to dismiss ten of Plaintiff's remaining claims.[4] Those claims fall into three groups. First, Defendants move to dismiss Plaintiff's RFRA claim. Second, Defendants move to dismiss Plaintiff's seven *Bivens* claims. Third, Defendants move to dismiss Plaintiff's FTCA claims for negligent supervision. The Court analyzes each group in turn.

**I.      RFRA Claim**

Defendants move to dismiss Plaintiff's RFRA claim on both 12(b)(1) and 12(b)(6) grounds. First, Defendants argue Plaintiff lacks standing to bring his RFRA claim (claim 2).[5] Relatedly, Defendants argue Plaintiff lacks standing to assert his official capacity claims for injunctive relief (claims 3–8). (*See* Doc. No. 81 at 25–28.) Second, Defendants argue Plaintiff has failed to state a claim for relief under RFRA. The Court analyzes each argument in turn.

**A.      Standing**

Defendants challenge Plaintiff's standing in two respects. First, they submit a declaration purporting to show Plaintiff's steady stream of communication with his family since March

---

[4] As noted above, Defendants initially moved to dismiss eleven of Plaintiff's claims. Because Plaintiff has since voluntarily dismissed his first claim, *see supra* n. 2, Defendants now move to dismiss only ten of Plaintiff's remaining claims.

[5] Defendants' Motion to Dismiss lists both standing and ripeness as reasons to dismiss Plaintiff's RFRA claim, but they do not distinguish between the two analyses. While these doctrines "substantially overlap in many cases," *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1157 (10th Cir. 2013), there are "important differences between the two doctrines," *id.* (citations omitted). Because Defendants' Motion to Dismiss focuses on whether Plaintiff has suffered any harm, which implicates standing, the Court analyzes Defendants' Motion to Dismiss on standing grounds alone. *See id.*; *see also* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3532.1 (3d ed. 2023) ("As compared to standing, ripeness assumes that an asserted injury is sufficient to support standing, but asks whether the injury is too contingent or remote to support present adjudication.").

2020, and argue Plaintiff lacks standing because he had access to free phone calls under the CARES Act. (*See* Doc. No. 81 at 26.) Second, Defendants argue Plaintiff lacks standing to bring any injunctive relief claim because his request for relief is too broad and there is no immediate threat of future injury.

As to Defendants' first standing challenge—that Plaintiff had access to some communication channels and the burden was therefore not "substantial"—this question is intertwined with the merits of Plaintiff's RFRA claim. Specifically, Plaintiff alleges his Muslim faith requires him to "keep and maintain close and health[y] relationships" with his family, all of whom live in East Africa and cannot afford to visit him in the States. (*See* Doc. No. 75 at ¶¶ 34–35.) Because "the telephone is the single means that may connect [him] and [his] family," Plaintiff submits that Officer Turner's block on Plaintiff's mother's, brother's, and sister's phone numbers imposed a substantial burden on Plaintiff's ability to exercise his sincerely held religious beliefs. (*Id.* at ¶¶ 37–38.) Defendants counter that Plaintiff only missed a few phone calls, and he had other opportunities to communicate with his family, so they did not substantially burden Plaintiff's exercise of religion. (*See* Doc. No. 81 at 25–27.) Resolution of this disputes goes to the merits of Plaintiff's claim. *Cf. Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 812 (10th Cir. 2022) ("Although missing one or two daily prayers might be considered a permissible burden on Mr. Ajaj's religious beliefs, that goes to the merits of his RFRA claim, not its justiciability."). Because resolution of Defendants' 12(b)(1) challenge is intertwined with the merits of Plaintiff's RFRA claim, the Court analyzes Defendants' argument under Rule 12(b)(6) in Section I(B) below. For the same reason—because Rule 12(b)(6) provides the appropriate

standard for assessing Defendants' argument—the Court disregards the declaration attached to Defendants' Motion. *See Holt*, 46 F.3d at 1003.

As to the second standing challenge, Defendants argue Plaintiff lacks standing to bring official capacity claims for injunctive relief, because Plaintiff lacks an actual or imminent future injury. (*See* Doc. No. 81 at 27–28.) The Court agrees.

To have standing to seek injunctive relief,

> a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal marks and citations omitted) (emphasis in original); *id.* (Future injuries, even those with an "objectively reasonable likelihood" of occurring, are not adequate to establish standing.). Allegations of "[p]ast exposure to illegal conduct" are insufficient to demonstrate an injury in fact warranting injunctive relief unless accompanied by "continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

Here, Plaintiff seeks an injunction requiring Defendants to "[follow] the law and existing BOP regulations at all time[s]." (Doc. No. 75 at 31); (*see* Doc. No. 94 at 12 (requesting injunctive relief to force the BOP to "follow[] its own regulations and restrain its staff from

violent acts or other violations against Plaintiff")).[6] But Plaintiff lacks standing for a few reasons. First, Plaintiff's request for an injunction ordering Defendants to "adhere with the law and existing BOP regulations at all time[s]" is too broad. *See Shook v. Bd. of Cnty. Commissioners of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) ("[I]njunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65."). Second, while Plaintiff plausibly alleges he still suffers adverse health effects from Defendants' past unlawful acts (*see, e.g.*, Doc. No. 75 at ¶¶ 176, 210, 214), the injunction he requests would not "prevent or redress" his ongoing injuries. *See Summers*, 555 U.S. at 493. He therefore lacks an adequate basis for equitable relief. *O'Shea*, 414 U.S. at 499. Finally, Plaintiff does not plausibly allege he will receive the same treatment in the future if he hunger strikes again. Indeed, Plaintiff emphasizes how most of the harm he endured during his 2020 hunger strike was unlike anything he had experienced during his many previous hunger strikes at ADX. (*See, e.g.*, Doc. No. 75 at ¶¶ 30, 49, 59, 68, 117, 132, 151, 162, 170, 174–75, 210, 213, 231.) This suggests the treatment is not a regular occurrence and unlikely to happen again. Plaintiff has not adequately pled an immediate threat of future injury. *See Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). The Court lacks jurisdiction to issue Plaintiff's requested injunction; the official capacity claims for injunctive relief should be dismissed.

### B.    Failure to State a Claim

"Congress enacted RFRA . . . in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 693 (2014). RFRA protects religious

---

[6] Plaintiff seeks injunctive relief in connection with his RFRA claim, but also in connection with several of his official-capacity *Bivens* claims. Defendants' standing challenge applies to both sets of claims. The Court addresses all claims for equitable relief here.

liberty by prohibiting the government from "substantially burden[ing] a person's exercise of religion" unless application of the burden is (1) "in furtherance of a compelling governmental interest" and (2) "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). Thus, to make a *prima facie* showing, Plaintiff must demonstrate he sought to engage in the exercise of his religion, and that the Defendant-officials substantially burdened that exercise. *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). The government then faces an "exceptionally demanding" burden of showing "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties[.]" *Burwell*, 573 U.S. at 728.

Defendants ask the Court to dismiss Plaintiff's RFRA claim for three reasons: (1) Plaintiff has not plausibly alleged he suffered a substantial burden on his exercise of religion (*see* Doc. No. 81 at 13–14); (2) the government's actions were the least restrictive means of furthering its compelling governmental interest (*see id.* at 14–15); and (3) Officer Turner is entitled to qualified immunity (*see id.* at 15).[7] The Court disagrees and will address each argument separately.

### 1.      Substantial burden on exercise of religion

As to whether Plaintiff has plausibly alleged that the government substantially burdened his exercise of religion, Defendants make two arguments. First, Defendants say "Plaintiff's communication with his family was not disrupted by [Officer Turner's] blocking three local

---

[7] Defendants do not question whether Officer Turner's actions implicate Plaintiff's exercise of his religion or whether Plaintiff's religious exercise is grounded in a sincerely held religious belief, and the Court sees no reason to do so. *Cf. Burwell*, 573 U.S. at 724 (Federal courts "have no business addressing []whether the religious belief asserted in a RFRA case is reasonable.").

VoIP phone numbers" because Plaintiff "admitt[ed]" he had access to free phone use under the CARES Act. (*Id.* at 13 (citing Doc. No. 75 at ¶ 221).) But Plaintiff alleges he did not have access to free phone calls until two months after Officer Turner blocked Plaintiff's family's numbers. (*Compare* Doc. No. 75 at ¶ 24 (alleging phone numbers were blocked in February 2020), *with* Doc. No. 75 at ¶ 221 (alleging free phone use started in April 2020).)[8] To the extent there is a factual dispute with respect to the timing of Plaintiff's access, that is not a matter that can be resolved on a motion to dismiss. *Iqbal*, 556 U.S. at 679.

Second, Defendants say Plaintiff alleges only a "mere inconvenience" to his religious practice because, for example, he "does not allege that his religion requires him to use local VoIP phone numbers that forward to long-distance numbers" and he "remains free to use the prison's mail and telephone service to communicate with his family." (Doc. No. 81 at 13–14.) To the extent Defendants are arguing that Plaintiff was free to engage in other forms of religious exercise, such an argument is foreclosed by Supreme Court precedent. *See Burwell*, 573 U.S. at 696 (RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."); *Holt v. Hobbs*, 574 U.S. 352, 361–62 (2015) (The "'substantial burden' inquiry asks whether the government has substantially burdened religious exercise," not "whether the [RFRA] claimant is able to engage in other forms of religious exercise."). And to the extent Defendants are arguing that the burden was insubstantial, that argument turns on facts

---

[8] Also, May 11, 2023 marked the end of the federal COVID-19 Public Health Emergency. *See End of the Federal COVID-19 PHE Declaration*, Center for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html (last accessed June 21, 2023). Plaintiff submits it was this emergency declaration that had been providing him access to free phone calls. (*See* Doc. No. 100 at 2.)

the Court does not resolve on a motion to dismiss. Defendants are correct that nothing in Plaintiff's SAC indicates he lost *all* access to familial contact through, for example, the traditional, non-VoIP phone service. However, Plaintiff plausibly alleges that depriving him of the VoIP service deprived him of the type of close family ties and contact that his religion calls for. (*See, e.g.*, Doc. No. 75 at ¶ 34.) Plaintiff also alleges the deprivation forced him into a "dangerous, sinful state" and feelings of "inner spiritual torture." (*Id.* at ¶ 42.) Determining whether the burden is substantial or not would require the Court to compare the access the VoIP service provides, compared with the access of the non-VoIP service, and assess whether the relative difference creates the type of deprivation Plaintiff describes in his Complaint. The Court cannot do that at this stage in the litigation. Accepting Plaintiff's well-pleaded allegations as true, and drawing all inferences in Plaintiff's favor, as the Court must, the Court finds Plaintiff has plausibly alleged that Officer Turner's purportedly retaliatory act substantially burdened Plaintiff's exercise of religion. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010) ("[A] religious exercise is substantially burdened under 42 U.S.C. § 2000cc–1(a) when a government . . . prevents participation in conduct motivated by a sincerely held religious belief"); *see also Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) (holding that prisoners' exercise of religion was substantially burdened when they were permitted some, but not all, of the food required to conduct their religious ceremony); *cf. Ra v. Braxton*, No. 7:04-cv-637, 2005 WL 1533124 at * 2 (W.D. Va. June 29, 2005) (holding maximum-security facility's denial of plaintiff's request to celebrate six "feast days" per year with exotic food prepared in a special manner as part of his Yoruba-Santeria religious faith "met the necessary showing, albeit minimally, that denial of the meals presents a substantial burden on his religious exercise").

### 2.      Compelling interest and alternative means

Because Plaintiff has pleaded his *prima facie* case, the Court next considers whether the government has met its "exceptionally demanding" burden of showing it has no "means of achieving its desired goal without imposing a substantial burden on the exercise of religion[.]" *Burwell*, 573 U.S. at 728. Defendants argue "the government has a compelling interest in prohibiting call-forwarding services to maintain both prison and national security." (Doc. No. 81 at 14–15.) But the question is not whether Defendants have a compelling interest in some general policy, but whether the facts, as alleged, demonstrate a compelling interest in depriving Plaintiff of VoIP service under the circumstances. *See Kikumura*, 242 F.3d at 962 ("[U]nder RFRA, a court does not consider the prison regulation in its general application, but rather considers whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant."). The answer is, no. Plaintiff does not allege facts tending to demonstrate, and Defendants do not identify, a compelling reason for restricting Plaintiff here.

Even if the government had demonstrated a compelling interest, the Court cannot discern whether it had alternative means for achieving its desired goal. Indeed, the only articulation of alternative means appears to be a single, citation-less sentence, in which Defendants argue that "[n]o alternative short of complete blocking will satisfy [its] compelling interest." (Doc. No. 81 at 15.) In short, the government fails to meet its "exceptionally demanding" burden here. *Burwell*, 573 U.S. at 728.

### 3.    Qualified Immunity

Qualified immunity "can be invoked by officials sued in their individual capacities for money damages under RFRA." *Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 813 (10th Cir. 2022). The Supreme Court has created a two-part test for deciding whether a defendant is entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). The Court must decide whether (1) "the facts that a plaintiff has alleged or shown make out a violation of a [federal statutory or] constitutional right" and (2) "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* "When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (citation omitted).

As explained above, Plaintiff plausibly alleges Officer Turner violated RFRA when she deprived Plaintiff of his ability to use the VoIP service to contact three of his closest family members; Plaintiff has thus carried his burden at step one. As for step two, Defendants submit their entire argument in a single sentence, arguing it is not clearly established that,

> an officer violates RFRA by blocking a convicted terrorist's access to local VoIP phone numbers to minimize a security risk, where the use of those numbers is prohibited by BOP policy . . . and where the prison does not unduly restrict the prisoner's use of the regular phone system, written communication, or in-person visits for the prisoner to communicate with his family.

(Doc. No. 81 at 15.) There are at least three problems with Defendants' framing of the "clearly established law" question. First, Defendants' framing assumes Officer Turner blocked Plaintiff's numbers "to minimize a security risk." (*Id.*) But Plaintiff has plausibly alleged Officer Turner blocked Plaintiff's numbers in retaliation for his filing an administrative grievance against her. (*See* Doc. No. 75 at ¶¶ 7, 14, 17.) Those allegations are entitled to an assumption of truth. *Iqbal*,

556 U.S. at 679. Second, Defendants' framing assumes the truth of the BOP's Program Statement, which Defendants submit forbids the use of VoIP phone numbers or call forwarding systems. But, as explained above, the Court takes judicial notice only of the contents of the BOP's Program Statement, not its truth. *See supra* n. 1. Moreover, there appears to be a factual dispute as to this issue. Defendants allege they do not permit it, but Plaintiff contends they do. (*See* Doc. No. 75 at ¶¶ 5, 8, 13, 16–17, 28–29, 40.) Any factual dispute over policies and practices cannot be resolved on this Motion. Third, Defendants' framing assumes ADX "does not unduly restrict the prisoner's use of the regular phone system [or] written communication." (Doc. No. 81 at 15.) But Plaintiff plausibly suggests otherwise. (*See, e.g.*, Doc. No. 75 at ¶¶ 10, 36–39.) In short, Defendants' framing is in tension with the rule that a plaintiff's well-pleaded factual allegations are "entitled to [an] assumption of truth." *Iqbal*, 556 U.S. at 679.

Given these deficiencies, the Court's obligation to construe the Complaint in the light most favorable to Plaintiff, *Erickson*, 551 U.S. at 93–94, and the brevity of Defendants' argument, the Court declines to address qualified immunity at this stage. In doing so, the Court is guided by a recent decision by Judge Wang. In *Mohamed v. Jones*, a case also brought by Plaintiff Khalfan Mohamed, Judge Wang noted that because "Defendants' argument is based exclusively on [an improperly narrow reading of plaintiff's complaint], the court declines to address qualified immunity beyond the argument asserted in the First Motion to Dismiss." No. 20-cv-2516, 2022 WL 523440 at *21 (D. Colo. Feb. 22, 2022). Judge Wang then explained:

> While the plaintiff generally bears the burden to satisfy the two-prong qualified immunity test once the defendant has asserted the defense, *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015), the court cannot conclude that Defendants' cursory argument, based on a factual framing rejected by the court, is sufficient to create that burden here. *See Halik v. Darbyshire*, No. 20-cv-01643-PAB-KMT,

2021 WL 4305011, at *4–*5 (D. Colo. Sept. 22, 2021) (explaining that the burden arises only when the qualified-immunity doctrine has been "adequately presented"); *see also Tillmon v. Cty. of Douglas*, No. 18-cv-00492-RBJ-KLM, 2019 WL 1375678, at *12 (D. Colo. Mar. 27, 2019) (where the defendants "offer[ed] no arguments and no law" to support a qualified-immunity defense, declining to rule on qualified immunity "without any briefing from defendants"), *aff'd*, 817 F. App'x 586 (10th Cir. 2020) (unpublished) (declining to address qualified immunity on appeal because the argument was not properly preserved for appeal, as the "analysis of qualified immunity in [the motion to dismiss] was cursory at best" and "consisted of a single paragraph briefly discussing the law of qualified immunity"). I am respectfully not persuaded that Defendants have invoked, at this juncture, a viable qualified-immunity defense.

*Id.* The same analysis applies here. The Court thus recommends denying Defendants' Motion with respect to Plaintiff's RFRA claim.

## II.    *Bivens* Claims

Defendants argue Plaintiff's *Bivens* claims (claims 3–9) should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. No. 81 at 3–11.) In 1971, in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, the Supreme Court recognized that a federal agent who commits an unconstitutional search and seizure can be held liable for damages through a right of action implied under the Fourth Amendment. *See* 403 U.S. 388 (1971). Over the next decade, the Court twice extended the implied cause of action to other constitutional rights. *See Davis v. Passman*, 442 U.S. 228 (1979) (establishing a Fifth Amendment cause of action for an employment discrimination case); *see also Carlson v. Green*, 446 U.S. 14 (1980) (establishing a claim for deliberate indifference to medical need under the Eighth Amendment). But since then, "the Court has performed its own version of Bonaparte's retreat from Moscow and progressively chipped away at [*Bivens*]—to the point that very little of its original force remains." *Silva v. United States*, 45 F.4th 1134, 1139 (10th Cir. 2022) (citation omitted). In *Egbert v. Boule*, the

Supreme Court articulated its most recent test for determining whether an alleged constitutional violation gives rise to a *Bivens* remedy:

> To inform a court's analysis of a proposed Bivens claim, our cases have framed the inquiry as proceeding in two steps. First, we ask whether the case presents "a new Bivens context"—i.e., is it "meaningful[ly]" different from the three cases in which the Court has implied a damages action. Second, if a claim arises in a new context, a Bivens remedy is unavailable if there are "special factors" indicating that the Judiciary is at least arguably less equipped than Congress to "weigh the costs and benefits of allowing a damages action to proceed." If there is even a single "reason to pause before applying Bivens in a new context," a court may not recognize a Bivens remedy.

142 S. Ct. 1793, 1803 (2022) (citations omitted). The Court then suggested this sequential inquiry is no sequential inquiry at all: "While our cases describe two steps, those steps often resolve to a single question: whether there is *any* reason to think that Congress *might* be better equipped to create a damages remedy." *Id.* (emphasis added); *see id.* (explaining that the "new context" inquiry incorporates the "special factors" analysis); *see also id.* ("A court faces only one question [in conducting a *Bivens* inquiry]: whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" (emphasis in original)). As for how well-equipped courts are to fashion a damages remedy vis-à-vis Congress, the Court explained that "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Id.* at 1800; *see id.* at 1803 (Congress should decide whether to provide a damages remedy "in most every case." (citation omitted)). And, even if a court thinks it is well-positioned to fashion a remedy in a particular case, "a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*," and "[t]hat uncertainty alone is a special factor that forecloses relief." *Id.* at 1803–04 (citations omitted).

Unsurprisingly, the Tenth Circuit, in interpreting *Egbert*, was "left in no doubt that expanding *Bivens* is not just a disfavored judicial activity, it is an action that is impermissible in virtually all circumstances." *Silva*, 45 F.4th at 1140 (citations omitted). The *Silva* court then articulated its "key takeaway from *Egbert*": "courts may dispose of *Bivens* claims for 'two independent reasons: Congress is better positioned to create remedies in the [context considered by the court], and the Government already has provided alternative remedies that protect plaintiffs.'" *Id.* at 1141 (quoting *Egbert*, 142 S. Ct. at 1804) (brackets in original).

Applying this standard here, the Court finds that a *Bivens* remedy is not available for any of Plaintiff's claims. As to Plaintiff's First Amendment retaliation claim against Officer Santisteven, "there is no *Bivens* action for First Amendment retaliation" because "[t]here are many reasons to think that Congress, not the courts, is better suited to authorize such a damages remedy." *Egbert*, 142 S. Ct. at 1807. The Court must thus recommend dismissing Plaintiff's First Amendment retaliation claim.

Plaintiff's remaining *Bivens* claims, all brought under the Eighth Amendment, fail for reasons outlined by the Tenth Circuit in *Silva*. First, the "availability of the BOP's Administrative Remedy Program offers an independently sufficient ground to foreclose [a] *Bivens* claim." *Silva*, 45 F.4th at 1141 (citing *Egbert*, 142 S. Ct. at 1806); *see id.* ("[T]he Supreme Court has long since described the BOP Administrative Remedy Program as an adequate remedy." (citation omitted)). Plaintiff nowhere suggests that the Program is unavailable to him. To the contrary, he submits that the "record/index of [his] administrative remedy filings show that he has filed at least 334 grievances" over the last 20 years. Doc. No. 75 at ¶ 46. And while all those claims have been denied, *id.*, it does not "matter that existing remedies do not

provide complete relief." *Egbert*, 142 S. Ct. at 1804 (internal quotation marks and citation omitted); *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (The BOP remedy program counts as a special factor if plaintiff had "full access to remedial mechanisms established by the BOP"). *Contra* Doc. No. 91 at 27–28 (arguing the existing remedies are unavailable because they have not afforded Plaintiff relief).

Second, the Court cannot say it is "undoubtedly better positioned than Congress to create a damages action" here. As the *Egbert* Court explained:

> [T]he relevant question is not whether a *Bivens* action would disrup[t] a remedial scheme, or whether the court should provide for a wrong that would otherwise go unredressed. Nor does it matter that existing remedies do not provide complete relief. Rather, the court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy.

142 S. Ct. at 1804 (citations and internal quotation marks omitted). It is unclear under what circumstances a court may properly take on this role, but those circumstances do not exist here. Even if the Court felt differently, it likely would not matter. The Supreme Court has reminded courts that "[e]ven in a particular case, a court likely cannot predict the "systemwide" consequences of recognizing a cause of action under *Bivens*," and "[t]hat uncertainty alone is a special factor that forecloses relief." *Id.* at 1803–04*; see id.* at 1803 ("[N]o court could forecast every factor that might counse[l] hesitation."). This Court humbly admits it cannot anticipate all the ways in which a damages remedy here would impact government operations at a systemwide level. That uncertainty forecloses relief.

## III.   FTCA Claims

Plaintiff also sues the United States under the FTCA, which "waive[s] the sovereign immunity of the United States for certain torts committed by federal employees." *FDIC v.*

*Meyer*, 510 U.S. 471, 475 (1994) (citing 28 U.S.C. § 1346(b)). Federal courts have jurisdiction over these claims if they are "actionable" under § 1346(b). *Id.* at 477. A claim is actionable under § 1346(b) if it alleges the following six elements, which require that the claim be:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* (alteration in original) (quoting § 1346(b)). Under the FTCA, "all elements of a meritorious claim are also jurisdictional." *Brownback v. King*, 141 S. Ct. 740, 744 (2021). So, for a court to have subject-matter jurisdiction, and for a complaint "to state a claim upon which relief can be granted," the "plaintiff must plausibly allege all six FTCA elements." *Id.* But even a claim that satisfies all six elements still fails if it falls within the FTCA's "discretionary function" exception. This exception bars claims against the government "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). Defendants argue Plaintiff's FTCA claims fail because Plaintiff does not allege the sixth element listed above for a *prima facie* claim, and because the discretionary function exception precludes the claim. The Court addresses each argument in turn.

### A.    *Prima Facie* FTCA Claim

Defendants argue Plaintiff has not adequately alleged the sixth element of his FTCA claims: that the United States, if a private person, would be liable under Colorado law. (*See* Doc. No. 81 at 28–29.) To plead negligent supervision under Colorado law, a plaintiff must plausibly allege defendant "has a duty to prevent an unreasonable risk of harm to third persons to whom

24

the [defendant] knows or should have known that the employee would cause harm." *Keller v. Koca*, 111 P.3d 445, 448 (Colo. 2005). Defendants argue Plaintiff fails to plausibly allege negligent supervision against Lieutenant Medrano and Warden True.

As to Lieutenant Medrano, Defendants submit "Plaintiff does not allege facts that Medrano disregarded or should have been aware of an unreasonable risk that [Officer] Santisteven would be violent toward Plaintiff, aside from referencing allegations that Medrano was present for the alleged excessive force." (Doc. No. 81 at 29.) The Court disagrees. Plaintiff's allegations amount to a plausible claim for negligent supervision under Colorado law because he plausibly alleges that Lieutenant Medrano knew or should have known that certain employees under his supervision would cause Plaintiff harm. (*See, e.g.*, Doc. No. 75 at ¶¶ 65–66, 183 (alleging facts which, accepted as true, show Lieutenant Medrano and Officer Santisteven colluded in falsifying Plaintiff's food-intake records); *id.* at ¶ 66 (alleging Lieutenant Medrano laughed at and acquiesced in Officer Santisteven's telling Plaintiff "eat or die" because "no one cares about your life"); *id.* at ¶¶ 69–70 (alleging Officer Santisteven referenced the ADX staff's 2018 violent group attack on Plaintiff and told Lieutenant Medrano it was going to happen to Plaintiff again); *id.* at ¶¶ 123–28, 131 (alleging Plaintiff stripped down to underwear to show the medical staff his extreme weight loss and that Officer Santisteven was fabricating his food-intake records, after which Lieutenant Medrano watched as Officer Santisteven roughly restrained Plaintiff's hands and waist, which left Plaintiff thinking "now they're going to kill me"); *id.* at ¶ 133 (alleging Lieutenant Medrano watched as Officer Santisteven "sadistically" hoisted Plaintiff off the ground using the chain around Plaintiff's waist while escorting Plaintiff to the medical room, forcing Plaintiff to try walking with the tips of his toes); *id.* at ¶¶ 136–38, 216 (alleging

Lieutenant Medrano watched as Officer Santisteven body-slammed a fully-restrained and incapacitated Plaintiff, who had not eaten in seventeen days and weighed 116 pounds, onto his side); *id.* at ¶ 139 (alleging Lieutenant Medrano refused Plaintiff's request to have an officer other than Officer Santisteven escort him back to his cell); *id.* at ¶¶ 142–45 (alleging Lieutenant Medrano observed without intervening as Officer Santisteven again "us[ed] the restraints [to] punish" Plaintiff and "cause[] [him] more pain" and told Plaintiff he planned to "get rid of [him], like killing terrorists").) Plaintiff has plausibly alleged a negligent supervision claim against Lieutenant Medrano under Colorado Law.

As to Warden True, Defendants submit "Plaintiff does not plead facts that plausibly suggest that True was or should have been aware of an unreasonable risk that Santisteven, Medrano, or . . . Conroy posed to Plaintiff." (Doc. No. 81 at 29.) The Court agrees as to Warden True's knowledge of Doctor Conroy; Plaintiff submits only conclusory allegations that Warden True was or should have been aware of the alleged risk Doctor Conroy posed to Plaintiff. (*See, e.g.*, Doc. No. 75 at ¶ 181 (alleging, without supporting facts, that Warden True "was fully aware of [Doctor Conroy's] . . . violations committed against [him] . . . [and] also participated in those alleged violations").) But the Court disagrees as to Warden True's alleged knowledge with respect to Lieutenant Medrano and Officer Santisteven. (*See, e.g.*, *id.* at ¶¶ 49, 51, 71 (alleging Plaintiff submitted first written request to Warden True, asking him to prevent staff from using force on him and reminding Warden True of ADX staff's prior attack during Plaintiff's 2018 hunger strike); *id.* at ¶¶ 71, 183 (alleging Plaintiff submitted second written request to Warden True, informing him Officer Santisteven and Lieutenant Medrano were fabricating his food-intake records and making "malicious[]" threats); *id.* at ¶¶ 90–92, 108, 186 (alleging Warden

True saw Plaintiff unusually weak and in bed); *id.* at ¶¶ 106, 184 (alleging Plaintiff submitted third written request to Warden True, noting Plaintiff's worsening conditions, again protesting Lieutenant Medrano's and Officer Santisteven's fabrication of Plaintiff's food-intake records, asking Warden True to ensure his safety, and requesting prison cell with a camera so Warden True could see that Lieutenant Medrano and Officer Santisteven were falsifying records).) Plaintiff has plausibly alleged a negligent supervision claim against Warden True under Colorado law.

### B.    Discretionary Function Exception

Defendants also argue the FTCA's "discretionary function" exception precludes Plaintiff's FTCA claims. (*See* Doc. No. 81 at 29–31.) Courts employ a two-part test to determine whether a challenged action falls within the scope of the discretionary function exception. As the Tenth Circuit recently explained:

> First, we "determine whether the challenged conduct 'involves an element of judgment or choice,' in which case it is discretionary and falls within the language of the exception, or whether it involves 'a federal statute, regulation, or policy that specifically prescribes a course of action for an employee to follow,' in which case the exception does not apply."

> If the conduct was discretionary, we move to the second step and ask "'whether that judgment is the kind that the discretionary function exception was designed to shield.'" In particular, discretionary decisions "grounded in the social, economic, or political goals of the [governing] statute and regulations are protected." Or, as this court has expressed the point, if the conduct "implicates the exercise of a policy judgment of a social, economic, or political nature," the discretionary-function exception shields the government from liability.

*Ball v. United States*, 967 F.3d 1072, 1076 (10th Cir. 2020) (citations omitted).

Here, Plaintiff alleges the BOP owes a duty to provide for the safekeeping and care of federal prisoners. (*See* Doc. No. 75 at ¶ 218 (citing 18 U.S.C. § 4042).) This is true. *See* 18

U.S.C. § 4042(a)(2). Defendants argue the BOP retains discretion in the means it uses to fulfill that duty. (*See* Doc. No. 81 at 30–31.) This is also true, as sister circuits have consistently held. *See, e.g.*, *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998) (explaining that "even if § 4042 imposes on the BOP a general duty of care to safeguard prisoners, the BOP retains sufficient discretion in the means it may use to fulfill that duty to trigger the discretionary function exception"); *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) (While § 4042(a) "sets forth a mandatory duty of care, it does not . . . direct the manner by which the [BOP] must fulfill this duty."); *Spotts v. United States*, 613 F.3d 559, 567 (5th Cir. 2010) ("[T]he Federal Bureau of Prisons [must] provide for the safekeeping, care, and subsistence of all federal prisoners, but [Section 4042(a)] does not indicate the manner in which the duty must be fulfilled."); *Rinaldi v. United States*, 460 F. App'x 80, 81 (3d Cir. 2012) (same). Defendants thus argue Plaintiff's FTCA claims must be dismissed. (*See* Doc. No. 81 at 30–31.)

The question, then, is whether Plaintiff identifies any discretion-constraining regulations or policies that take the challenged actions outside the scope of the discretionary function exception. The Court finds he has. Specifically, Plaintiff has plausibly alleged that the Code of Federal Regulations constrained Lieutenant Medrano's judgment. *Compare, e.g.*, 28 C.F.R. § 549.62(a) (BOP "[s]taff *shall* refer an inmate who is observed to be on hunger strike to medical or mental health staff for evaluation") (emphasis added), *and* 28 C.F.R. § 549.64(c) (BOP "[s]taff *shall* remove any commissary food items and private supplies of the inmate while the inmate is on a hunger strike") (emphasis added), *with* Doc. No. 75 at ¶¶ 53, 57–67, 183 (plausibly alleging Lieutenant Medrano and Officer Santisteven (1) colluded in falsifying Plaintiff's food-intake records to avoid referring Plaintiff to medical or mental health staff for

evaluation, and (2) refused Plaintiff's request to "remove [his] personal food items from the cell, as required by [BOP] policy").[9] These regulations also apply to Warden True, *see* 28 C.F.R. § 500.1(b) (defining "staff" as "any employee of the [BOP] or Federal Prison Industries"), who Plaintiff plausibly alleges was on notice of these violations and failed to act. (*See* Doc. No. 75 at ¶¶ 49, 51, 71, 106, 183–84, 218.) Because federal regulations specifically prescribe non-discretionary courses of action, Plaintiff's FTCA claims are not precluded by the discretionary function exception. *See Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (explaining exception does not apply when a federal regulation specifically prescribes a course of action that an employee does not follow because "the employee ha[d] no rightful option but to adhere to the directive"); *cf. Ashford v. United States*, 511 F.3d 501, 505 (5th Cir. 2007) (reversing grant of summary judgment in part because plaintiff identified a prison policy that required that he be put into solitary confinement pending investigation of an asserted threat to his safety). It remains to be seen whether Defendants actually violated any regulations or policies, but at this juncture, Plaintiff's negligent supervision allegations are enough to survive Defendants' Motion.

## CONCLUSION

For the reasons set forth above, the Court **recommends DENYING in part and GRANTING in part** Defendants' Motion to Dismiss. Specifically, the Court recommends:

    1) **DENYING** Defendants' Motion to Dismiss as to Plaintiff's RFRA claim (claim 2);

---

[9] Plaintiff also alleges Lieutenant Medrano "intentionally ignored" ADX procedure for ensuring his safety when Officer Santisteven roughly restrained Plaintiff before escorting him to the medical room. (*See* Doc. No. 75 at ¶¶ 127–32.) But Plaintiff does not specifically allege that procedure was mandatory.

2) **GRANTING** Defendants' Motion to Dismiss as to Plaintiff's official-capacity claims seeking injunctive relief (claims 2–8);

3) **GRANTING** Defendants' Motion to Dismiss as to Plaintiff's *Bivens* claims (claims 3–9); and

4) **DENYING** Defendants' Motion to Dismiss as to Plaintiff's FTCA claims for negligent supervision (claims 12–13).

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th St., Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge and will result in a waiver of the right to appeal from a judgment of the district court based on the magistrate judge's proposed findings and recommendations. *See Vega v. Suthers*, 195 F.3d 573, 579–80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059–60 (a party's objections to the magistrate judge's report and

recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (noting firm waiver rule does not apply when the interests of justice require review).

Dated June 27, 2023.

**BY THE COURT:**

_____
Maritza Dominguez Braswell
United States Magistrate Judge