IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

AUG 14 2023

JEFFREY P. COLWELL
CLERK

Mohamed V. Santisteven et al. No. 21-CV-02676-NYW-MDB

PLAINTIFF'S MOTION FOR JUDICIAL NOTICE—FROM THREE DISPUTED
FACTS—DURING THE COURT'S UPCOMING RULING ON PLAINTIFF'S
OBJECTIONS TO THE MAGISTRATE'S JUDGE RECOMMENDATIONS
ON THE MOTION TO DISMISS

|  |  | INSIDE THIS MOTION: |  |
|---|---|---|---|
| - |  | Standard of Review | 1 |
| - |  | Argument | 2 |
|  |  | THE THREE ISSUES PRESENTED FOR JUDICIAL NOTICE HERE: | 2 |
| A |  | The Inspector Generals Findings And Conclusions... | 3 |
|  | 1 | The Background of the OIG's Notification | 3 |
|  | 2 | The BOP Do not Rely on Prisoners' Testimonies | 3 |
|  | 3 | The BOP's Practice is Contrary to the Applicable Laws and Regulations | 4 |
|  | 4 | The consequences of The BOP's Rejection of Prisoners' Testimonies... | 4 |
|  | 5 | As a Result of BOP's Intentional Rejection of Prisoners' Accounts, Almost All of BOP's staff Abuses Against Prisoners Are By Design Found "un Sustained" | 5 |
|  | 6 | The Local Wardens Are Incharge On Whether to charge... staff | 6 |
| B |  | The Government's Decision to Concede in Plaintiff's Three Medical Deliberate Indifference claims in Mohamed V. Jones et al... | 7 |
| C |  | The Government's Decision... In Not Seeking, Through Congress, An Explit statute That would preclude Fed. Prisoners From Judicial Review... | 8 |
|  |  | Conclusion | 9 |

Pursuant to the Rule 201 of Federal Rules of Evidence, ("FRE) plaintiff, respectfully, files this motion and asks the court to make judicial notice from three indisputed issues or facts detailed bellow. That is in connection with plaintiff's recently filed objections to the magistrate Judge's Recommendations, Doc. 109, on the motion to dismiss.

STANDARD OF REVIEW:

The Rule 201, 1d, provides at: 201(b), (c) that: "The court may judicially notice a fact that is not subject to reasonable dispute because it is generally known within the trial court's teretorial jurisdiction, or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The

court may take judicial notice on its own; or must take judicial notice if a party requests it and the court is supplied with the necessary information". Id. However, this rule governs judicial notice of an adjucative facts only, not a legislative acts facts". FRE 201(a). The " adjucative facts are simply the facts of the particular case". United States v. Wanly. 133 F.3d 758. 764 (10th Circ. 1998).

## ARGUMENT:

Because the three facts detailed below are "not reasonably disputed" and are "generally known within" this "court's territorial jurisdiction", or can be "accurately and readily determined" that their respective "sources... accuracy cannot reasonably be disputed". Id. this court should take the requested judicial notice. Moreover, the three issues are also relevant and therefore the requested "judicial notice is proper" since those issues are "beyond debate" and "are matters of public record". See Diné Citizens Against Ruining Our Env't v. Haaland, 59 F.4th 1116. n.5 (10th Circ. 2023).

Thus, this court should ignore and reject the defendants' expected disputing and questioning of these facts, their relevence, and the accuracy of their respective sources... Those goverment's anticipated disputes and questions cannot be reasonable here, because as stated above; the three issues meet the necessary conditions as well as they're certainly relevant here.

## THE THREE ISSUES PRESENTED FOR JUDICIAL NOTICE HERE:

A- The Inspector General's Findings And Conclusions As set Forth In His "Notification Of Concerns Regarding the Federal Bureau Of Prisons' (BOP) Treatment Of Inmate Statements In Investigations Of Alleged Misconduct By BOP Employees".

B- The Government's Decision to Concede in Plaintiff's Three medical; Deliberate Indifference claims in " Mohamed V. Jones et al.

C- The Government's Decision, or, otherwise, Inaction In Not Seeking, Through Congress. An Explicit Statute That Would Explicitly Preclude Federal Prisoners From Judicial Review For Monetary damages...

Those are three issues or facts that plaintiff detailing below, and in so doing, asking this court to take judicial notice therefrom.

The first fact shows that, even through the OIG/ U.S. Department of Justice itself; the BOP intentionally mis-handling prisoners' complaints including Admn. Remedy.

The second fact shows that the magistrate's recommendations went further and beyond the goverment's expectation. That's defendants already conceded; Egbert don't impact medical claims.

The last fact shows that government knows; Congress wouldn't ban prisoners from suing for damages.

2

A- The Inspector General's Findings and Conclusions As They Are Set Forth in His "Notification of concerns Regarding The Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct By BOP - Employees:

In October 12, 2022, the office of the Inspector General ("OIG") through the Inspector General, Michael E. Horowitz, issued the above titled "Notification" ("Notification") in which the OIG made several findings and conclusions all of which are necessarily relevant in this case, especially with relation to plaintiff's argument that; in this case the Administrative remedy ("A.R.") is not available, because the A.R. provided plaintiff "with a simply dead end". See plaintiff's Response to Motion to dismiss, Doc. 91 p.27-28 and his objection to the Magistrate Judge's ("M.J's) recommendations p.10-16.

The OIG's Notification is attached herein as Exhibit 1, for the Court's own reviewal. However, plaintiff briefly points out onto several of the OIG-findings while also asking the court to make its judicial notice as its Ruling on plaintiff's above mentioned objections to the M.J's recommendations ("REC.").

This section contains six following subparts:

1- The BackGround Of The OIG's Notification: The Notification was issued by the OIG after the OIG's investigation related to BOP employee's alleged sexual abuse of some female BOP prisoners. Following the OIG's conclusion of its investigation, the BOP, through a warden, imposed 10-days suspension on the said employee, which's according to the OIG, is far a lenient punishment for such serious crime which the OIG had already concluded that had actually occured. The OIG then was informed by the BOP, through its Office of Internal Affairs (OIA) that the decision to simply impose such lenient punishment was result-ed from the BOP's practice that "the BOP will not rely on inmate testimony to make administrative misconduct findings and take disciplinary action against BOP employees, unless there is evidence aside from inmate testimony that independantly establishes the misconduct, such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject". Ex.1 p.1. It:

It was that regular and BOP-wide treatment of prisoners' testimonies, which the OIG found both; contrary to the law and regulations, as well as unacceptable, that led the OIG into compelling its findings and conclusions as set forth in the notification, Ex.1 (The notification also includes the OIG-three recommendations, the BOP's response and the OIG "Analysis/Appendex 2) on the BOP's mentioned response. Some of the OIG findings include:

2- The BOP Do Not Rely On Prisoner's Testimonies: As stated above, "the BOP will not rely on inmate testimony..." Ex.1 p.1, 3, 6-7. The OIA Further

3-

informed the OIG that the "BOP follows this practice even when there are multiple inmates with corroborating accounts, such as in the OIG investigation described above." That view was also "echoed in the BOP's response to the OIG's draft memorandum". Id. p. 6.

3- The BOP's Practice Is contrary to the Applicable Laws and Regulations: The above BOP's practice of ignoring prisoners' testimonies and accounts" is inconsistent with the federal court practice in criminal cases, and arbitrarily and unjustifiably dismisses inmates testimony, which may be highly credible and provided by several inmates" Id. p. 4 (Emphasis added). In addition, the OIG concluded that within the Federal laws and regulations, Department of Justice, BOP's own policies, and its Collective Bargaining Agreement "there are no provisions... that require inmate testimony against employee to be disregarded, discredited, or given less weight than employee testimony" p. 5 ( citations omitted)-Moreover, the OIG concluded that "the view that the declination of criminal prosecution meant that inmates' testimony was not strong enough to support administrative findings is contrary to the distinct burdens of proof in administrative and criminal cases. Specifically... administrative cases, including PREA cases". See 5 U.S.C. §§ 7121 (e) (2); 7701 (c) (1) (B); CFR §1201. 56 (b) (1) (ii). Id. p. 7 (Emphasis added).

4- The consequences of the BOP Rejection of Prisoners' Testimonies Include, but Not Limited to, Relying on increadeble and "Unsupported" Factual Records: Imposing Linient Penalty On BOP's Criminally Behaving Staff, Emboldling The staff In Their Abusive Acts Against Prisoners , And Failing to Hold Those Abusive Staff Accountable For Their Crimes: Because the BOP ignores and rejects prisoner's (i.e. victim's) account it relies on its own staff's account and in doing so, knowingly and intentionally, choses false naratives over the trustworthy ones. See Id. p. 2, 6 (the BOP completely rejecting the OIG Report of Investigation that was compiled from other sources, from prisoners who were the victims of the BOP staff rape and other eye-witness..., and instaid, BOP preferred to accept the officer's false statement... Before the warden handed down his 10-days suspension penalty (for raping two fimale prisoners). That BOP's decision, the OIG concluded "was unsupported by the factual record". Id. In addition to those consequences of relying on increadeble evidence and imposing "unreasonably lenient penalties on staff" the BOP practice of rejecting prisoners' sides of the story will likely embaldens miscreant staff members in their interactions with inmates because such staff may act without fear of disciplinary consequences", and may also "result in the BOP failing to hold

4-

staff members accountable for potentially false statements made during an investigation, as occurred in the OIG investigation described above." Id, p. 3-4.

5- As a Result of BOP's Intentional Rejection Of Prisoners' Accounts, Almost All of BOP's Staff's Abuses Against Prisoners Are By Design Found "un sustained": One Relevant example should suffice to show how the BOP, by rejecting its victims' allegations, intentionally allows the BOP staff go free and thus, keep repeating their abusive acts against Prisoners: According to the OIA Report, released by the BOP last year, in the year 2020 (fiscal year) the same year in which the ADX's staff violated plaintiff's rights as are alleged in his complaint in this case, there were 1,254 cases of physical abuses misconducts by BOP staff against prisoners. However, only three of those cases were sustained following the OIA's own investigation. That means, over 99.7% of the cases were found un-founded. See the "Report" by the OIA, p. 9, Table 1, p. 12, Table 2. See also p. 24 (stating that only three cases were sustained; one inmate sustained "minor/slight injury", and the other "two inmates... sustained minor/no injuries (harassment). See also "Prison Legal News (PLN)" with Fox in charge of the Henhouse" Almost All Misconducts Accusations Against BOP staff Result in No Discipline" (p. 1-10, March, 2023).

Relates to that findings; certainly, do not include plaintiff's injuries sustained from the ADX's staff; defendants here. As plaintiff alleged in his complaint, See the Response, Doc 91P-95, sustained serious injuries. And for the court's awareness, plaintiff not only filed his A.R's and his FTCA's complaints following the alleged abuse, but also he wrote a complaint directly to the OIA to which the OIA never responded. Plaintiff was never questioned nor his injuries assessed as the result of his multiple complaints. This is also the case in other previously committed crimes against plaintiff as he alleged in his previous case. See Mohamed v. Jones et al No. 20-cv-02516-RBT-MDB.

Plaintiff also notes here, that the OIA report also provides somehow higher figures on some of "misconducts" that are also found "sustained" but those misconducts are "non-inmate" related, and therefore are irrelevant here. Plaintiff case and all of his argument are based on BOB staff's alleged violation of his rights... Similarly, his argument that the BOP A.R. is not available, and finally his present motion for Judicial Notice; all are under argument that the BOP do not hold its official accountable for their violations against plaintiff, particularly, and against other prisoners, generally. Plaintiff does nothing concerning BOP staff's currptions that do nothing against him.

6- The Local Wardens Are Incharge On Whether to Charge an Alleged violent Staff, Discipline Him, And Whether to close The Investigation: As it has been shown above, Supra, at. No. 1, 2; warden in the above event decided to give 10-days suspension to the rapist officer. That's is the warden who decides what kind of penalty an officer deserves as long as the case is not selected for criminal prosecution, which's itself, and by design, is not an easy thing to happen. Under the BOP's policy; once the OIA "investigate" an alleged violation, it sends its "complaint" to a local CEO "for edification and review". Only after the CEO determination that "misconduct might have occurred", he or she then make an appropriate referral back to the "OIA" which once again, would kick back the case to the "CEO" "for action". The procedures apply to all local staff misconduct investigations in which the BOP employees are Subject. See the OIA report, p. 6. The "Chief" is also incharge of deciding "whether to close the file. Program statement: Internal Affair, office of 5-20-2003.

The CEO, per 28 CFR 500·1(a) is the warden. It's clear then, why the BOP, virtually in all cases, concludes that its staff commit no wrong. In many, if not most cases, the wardens themselves are not less involved in alleged crimes than their officers. In this case, as plaintiff alleges, Warden True worked shoulder-to-shoulder with his officers in violating plaintiff's rights. That's the same role played by his predecessor under whose administration the previous alleged violations accrored, See Mohamed v. Jones et al. Id. In that case, the then warden and the BOP chose to reward the leading criminal officer against the plaintiff by promoting him to even a higher position. See Mohamed v. Jones, Id. Doc. 155. p. 8. at. 44 (Goverment answer; admits plaintiff's allegations that the BOP soon after the officer led the attacks on plaintiff, raised him in rank to be a Lievtenant (Lt). See also Mohamed v. English, et al No. 1:22-cv-03213-GPG-MDB ( another case alleging violations of various plaintiff's rights ... Once again, the ADX's warden is a named defendant... under whose leadership; the other staff fearlessly and without any prior notice to plaintiff, cut him off from all kinds of correspondence, religious services and materials...).

In Sum, the wardens: being incharge of initiating and ending investigations as well as of imposing penalty on staff, as detailed above, in addition to their own regular misconducts against prisoners, is a fact that need to be judicially noticed by this court along with all other sections shown above. The defendants cannot argue for the A.R. effectiveness and efficacy while at the same time the department of justice (OIG) concludes in the highest level of mistreatment of prisoner's complaints throughout the BOP system. That should be noticed

Finally here the government may incorrectly argue that the above mistreatment of prisoners' complaint should not be judicially noticed, That's because, among other possible reasons; the BOP has agreed to the OIG's three recommendations. See the Notification Ex.1, p.9-16. CBOP Director stating agreement on two of the three recommendations. Also, on August 1, 2023, BOP posted Program Statement #1210.25 "Internal Affairs Office", in which the BOP seems to concede its previous, decades long mistreatment of prisoners' complaints..; by agreeing to amend its policy..., that the BOP should assess "the credibility of an alleged victim, suspect, or witness" regardless of "person's status as inmate or employee". Id, p.9, at.6, d. That potential argument should be rejected for several legitimate reasons such as, One: By virtue of its almost a century-old mistreatment of prisoners' complaint; the BOP even with good faith, can not fix such old and well-established problem; Two: Because the above mistreatment was against all applicable laws and regulations, See supra p.4 #2, and thus; intentional, it's most likely the BOP will continue to mistreate prisoners' complaint..., since the bad faith is still within the BOP's staff; Three: Even without the existence of the above two reasons; no one should realistically believe that the BOP will treat prisoners' complaints adequately while at the same time; the rest of BOP's regulations, including those give the local wardens almost the complete prosecutorial authority, remain in place. As plaintiff briefly showed above; almost in all cases wardens themselves directly involved in alleged violations... They therefore must protect their officers so to protect themselves; Four: Regardless of the above reasons; even with 100% achievement in properly treating prisoners' complaints; that 100% achievement will not address the BOP's past violation of plaintiff's rights nor will it guarantee plaintiff that the violation will not once again re occure; the key condition established in Egbert court.

In short, while the BOP's submission to the OIG's recommendation is certainly a clear indication that the BOP concede to its illegal and improper practice of plaintiff's and the rest of prisoners' complaints, that mere submission does nothing to address the alleged violation in this case, neither does it gives plaintiff any level of assurance that the BOP staff will not maliciously and sadistically attack him again and will not be deliberate and indifferent towards his substantial and serious medical needs once more.

B- The Government's Decision to Concede in Plaintiff's Three Medical: Deliberate Indifference claims in Mohamed V. Jones et al. Id:

While the M.J. recommended the dismissal of all Bivens claims including the three medical/deliberate indifference claims in plaintiff's complaint based on Egbert and Silva precedents; the government in Mohamed V. Jones. id

7-

decided not to challenge the court decision in the above case to allow the three medical claims to proceed. After the defendants in that case filed their objection, doc. 116 that included their argument in support of the three and other claims dismissal, they did not raise that opposition in their "motion for Reconsideration" that they filed after the Supreme Court's ruling in Egbert. See the motion. doc 128.

Furthermore, defendants also decided not to contest the District Judges ruling on adopting the then magistrate's de recommendation on those three claims when they filed their appellate brief on 3·15·23 doc. 010110826863 which came long after Egbert and Silva were concluded.

The fact that the government in that case conceded to those medical claims is very relevant here for the purpose of judicial notice. Defendant's said decision only came about due to the government correct understand in this particular issue that Egbert and Silva don't control plaintiffs' medical claims, contrary to the Recommendation conclusion.

It cannot be correctly argued that the government had any other reason, at least, a good one. Thus, the Recommendation went beyond government's expectation. The court now should take judicial notice... If the medical claims could properly proceed in Mohamed v. Jones even after Egbert and Silva, why can not they proceed in Mohamed v. Santisteven et al here.

C· The Government Decision, or, Otherwise, Inaction In Not see-king, Through Congress, An Explicit Statute That Would Ex-plicitly Preclude Federal Prisoners From Judicial Review For-Monetary Damages:

The government and B.O.P. have forever argue that their prisoners should not be allowed by the federal courts to sue for damages through Bivens cause of action. That argument has been even further enforced following the Supreme Court's decision in Ziglar v. Abbasi, 137 S. Ct. 1843 (2019). Throughout those years and especially after Abbasi, the B.O.P and its government attorneys have spent a count-less amount of efforts, and in the process, caused the U.S. courts of all federal levels, to spend their resources and time in deci-ding whether Bivens remedy should or shouldn't be implied on prisoner's cases. All that happens after U.S. Congress passed the Prison Litigation Reform Act. (PLRA) in 1997, which the government argue does not authorise monetary dama-ges for prisoners.

However, and relevant here, is the undisputed fact that the B.O.P. and the government have not gone to Congress (to plaintiff's limited knowledge) for another legislation that would clearly and explicitly put the above dispute, of whether prisoners can or cannot sue for money, to the end.

The B.O.P. and the government are capable of such legislative move. The

BOP and the government have recently proposed new rules related to "Inmate Financial Responsibility Program" see the proposed rules 28 CFR part 545 (January 10, 2023). In that proposed rule the BOP expressed its will to take more money from prisoners' accounts. Plaintiff do not know what happened or will happen concerning with the proposed rule which was pending for public comments. However, plaintiff is aware that at least some US. law-makers have opposed the rule (see for example Congressman, J. Nadler's letter to US. Attorney, Garland, dated March 13, 2023; opposing the proposed regulations).

The relevant fact for the judicial notice here is that the government is fully capable of proposing a regulation that will explicitly and completely prevent prisoners from suing federal prison staff..., and limit prisoners' complaint to BOP half-page long A.R. And in doing that the congress and the public will have their moment for their respective roles..., as it has just happened with the above refranced proposed regulation. The government failure to do just that, regardless of decades long legal battles: in courts resulting into unknown spending of government's and court's resources, may only indicate that such government failure is necessarily caused by its certain knowledge that the US. law makers on the one hand, and the US. public, on the other, are not in favor of approval of such draconian regulations. The government saw it more convenient to convince the court that the congress didn't mean to allow demages suits when it created the PLRA and thus, federal prisoners shouldn't be allowed to sue for demages, than convincing Congress and the public that the terms of PLRA should be replaced by a statute that will kick out brutalized prisoners from US. courtrooms. because, after all, the half-page long A.R. is "available" as long as the victimized prisoner is capable of getting and writing it, and afford the postage stamps.

## CONCLUSION:

For the reasons stated above and all other reasons the court finds appropriate, the court should grant this motion and take the judicial notice from those three above discussed issues.

Dated: August 8, 2023.

Khaifan Kh. Mohamed,
U.S.P. Max. P.O.Box 8500
Florence, Co. 81226-8500

Khaifan Kh. Mohamed
s/ Mohamed.

9-

# CERTIFICATE OF SERVICE

I, Khalfan Kh. Mohamed, hereby certify that on August 8, 2023 have mailed my Motion for judicial notice, addressed to:

Office of the clerk
United States District Court
901-19th St, Room A105
Denver, Co 80294-3589.

Dated: August 8, 2023

Khalfan Kh. Mohamed
U.S.P. max P.O.Box 8500
Florence, CO 81226-8500

Khalfan Kh. Mohamed
S/Mohammed

EXH: 1: Notification of Concerns ... (from the Office of
Inspector General (OIG) (16-pages long)



**DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL**

October 12, 2022

Management Advisory Memorandum

To:         Colette S. Peters
            Director
            Federal Bureau of Prisons

From:       Michael E. Horowitz
            Inspector General

Subject:    Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of
            Inmate Statements in Investigations of Alleged Misconduct by BOP Employees

---

The purpose of this memorandum is to notify you of serious concerns the Department of Justice (DOJ or Department) Office of the Inspector General (OIG) has with the manner in which the Federal Bureau of Prisons (BOP) handles investigations of alleged misconduct by BOP employees. These concerns arose when the OIG recently inquired of the BOP's Office of Internal Affairs (OIA), a component of the BOP's Office of General Counsel (OGC), about a disciplinary action taken by the BOP following an OIG investigation of alleged sexual abuse by a BOP employee. In response to our inquiry, we were told by OIA that, in cases that have not been accepted for criminal prosecution, the BOP will not rely on inmate testimony to make administrative misconduct findings and take disciplinary action against BOP employees, unless there is evidence aside from inmate testimony that independently establishes the misconduct, such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject. The OIA further informed the OIG that the BOP uses inmate statements in administrative proceedings solely for investigative lead purposes. After reading a draft of this memorandum, the BOP told the OIG that it does not have a practice of not relying inmate testimony in administrative misconduct cases and asked the OIG to speak with additional BOP employees, which we did. However, despite those additional interviews, the circumstances that gave rise to this memorandum and the BOP's conflicting response to it continue to raise significant concerns about the BOP's handling of disciplinary matters in cases where inmate testimony is necessary to sustain misconduct charges.[1]

---

[1] After reviewing a draft of this memorandum, the BOP wrote, "OIA did not say that BOP will not rely on inmate statements, nor did OIA say that it will substantiate misconduct only if there is evidence aside from inmate testimony, nor that inmate statements are used solely for investigative lead purposes. OIA routinely collects inmate statements during investigations which are relied upon during the course of the investigation. In some cases, inmate statements are used for investigative lead purposes, but that is not the sole purpose." However, contrary to this assertion, the statements made by the OIA to the OIG as reflected in this memorandum were made by OIA on multiple occasions. Moreover, as described later in this memorandum, we found that in cases where the OIG substantiated BOP employee misconduct relying on inmate testimony the OIA has, on more than one occasion, sent less serious findings to the BOP's Employment Law Branch (ELB) and the BOP institution where the subject employee works.

In the case giving rise to our inquiry, an OIG investigation determined, based on the testimony of several BOP inmates as well as other evidence, that a BOP employee engaged in serious misconduct involving sexual activity with two inmates and failing to provide truthful information to the OIG. Upon conclusion of the OIG investigation, the OIG provided the BOP with its report of investigation that detailed the OIG's findings of administrative misconduct by the BOP employee so that the BOP could adjudicate the employee's misconduct and determine what discipline should be imposed. The BOP's disciplinary action for such misconduct was limited to a suspension for a period of ten days. In explaining its decision, the BOP informed us that the penalty was based on its finding that the employee's substantiated misconduct was limited to an appearance of an inappropriate relationship with an inmate, not the sexual misconduct or failure to provide truthful information findings described in the OIG's report of investigation. Subsequent to this BOP disciplinary decision, additional BOP inmates made further sexual abuse allegations against the BOP employee and the OIG conducted further investigative work related to the BOP employee. Following this investigative work, criminal charges were brought against the BOP employee in connection with both the original allegations and allegations related to the additional BOP inmates. The BOP employee was criminally convicted of engaging in a sexual act with one of the two inmate victims described above.

The information from OIA that the BOP will not rely on inmate testimony to make misconduct findings in administrative matters (absent independent evidence establishing the misconduct, such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject) is inconsistent with the fact that such testimony is fully admissible in criminal and civil cases, and creates significant risks for the BOP in its handling of administrative misconduct matters. Inmate testimony alone has been found sufficient, and with corroborating evidence is often found sufficient, to support criminal convictions of BOP employees, where the evidentiary standard is proof beyond a reasonable doubt. In short, inmates are not disqualified from providing testimony with evidentiary value in federal courts, and there is no valid reason for the BOP to decline to rely on such testimony other than for investigative lead purposes in administrative matters, where the evidentiary standard is the preponderance of the evidence. In addition, the OIG found that in the context of sexual misconduct cases, BOP policy and federal regulations, specifically those DOJ regulations implementing the Prison Rape Elimination Act (PREA), require the credibility of an alleged victim to be assessed on an individual basis and not be determined by the person's status as an inmate.

The OIG often substantiates misconduct by BOP employees in cases where it finds that inmate testimony is credible and is corroborated by other information, even if the corroborating information does not independently establish the misconduct. For example, in the case referenced above that led to our inquiry of the BOP, the OIG obtained highly credible testimony from two female inmates who separately told the OIG that a BOP employee had engaged in sexual acts with them in the prison facility. Regarding one of the occasions, the OIG obtained video evidence showing the BOP employee enter an office in the BOP facility with one of the inmate victims and that the two remained in the room for nine minutes with the lights off. Further, during those nine minutes, the video showed several inmates looking into the room through a glass window. When questioned by the OIG, two of those other inmates, after at first denying that they observed the BOP employee and inmate engaged in sexual activity, told us that they had observed the BOP employee and the female inmate engaged in sexual activity. Additionally, a number of other inmates provided information that they had become aware of the sexual relationships between the BOP employee and the inmate. When questioned by the OIG, the BOP employee denied the allegations in their entirety and claimed that he was only talking with the inmate in the darkened office for those nine minutes. The BOP employee further told the OIG that it was his practice to keep the lights off in his office; however, video of the office taken later in the day after the sexual misconduct (but before the OIG's interview) showed the employee in the office with the lights on. Based on this inconsistency in his testimony and other factors, the OIG did not find the BOP employee to be credible. After the matter was declined for criminal prosecution,

the OIG forwarded its report of investigation detailing the evidence of the employee's misconduct to the BOP. The BOP only substantiated that the BOP employee had engaged in the appearance of an inappropriate relationship with an inmate by going into the darkened room for nine minutes with the inmate, not the sexual misconduct or failure to provide truthful information statements findings described in the OIG's report of investigation. The BOP imposed a ten-day suspension on the BOP employee for the misconduct. The OIA informed the OIG that this outcome was the result of the BOP opting not to rely on inmate statements to make administrative misconduct findings and take disciplinary action against BOP employees, unless there is evidence aside from inmate testimony that independently establishes the misconduct, such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject. After the BOP employee had served the ten-day suspension and returned to the institution, additional BOP inmates made sexual abuse allegations against the BOP employee, criminal charges were brought against him, and the BOP employee was ultimately convicted of engaging in a sexual act with one of the inmate victims described above.

After reviewing a draft of this memorandum, the BOP suggested that the OIG speak with representatives of the BOP's Office of General Counsel Employment Law Branch (ELB), which conducts legal review of misconduct findings by OIA and discipline proposed by Human Resources staff within BOP institutions, and the BOP's Human Resource Management Division Labor Relations Branch (LRB), which defends the BOP in union arbitrations involving allegations of unfair labor practices, allegations of violations of the BOP's Collective Bargaining Agreement, and other labor-related allegations. Following our discussions with these representatives, the OIG continues to have serious concerns about the BOP's treatment of inmate statements in administrative investigations and overall handling of alleged misconduct by BOP employees. The OIG found that, while the BOP does not have a formal policy or practice of categorically rejecting inmate testimony, the BOP is reluctant to rely on inmate testimony in administrative matters, has a general practice of avoiding calling inmates as witnesses in Merit Systems Protection Board (MSPB) and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly more than the applicable preponderance of the evidence standard to sustain employee misconduct and impose discipline.[2] In addition, the OIG found that different officials within the BOP's OGC have differing views of how inmate testimony should be treated in employee misconduct investigations and that the BOP does not have a formal policy addressing this issue, which has resulted in confusion and inconsistency in what OIA and ELB view as BOP's policy. These issues have the potential to lead to the mishandling of disciplinary actions by the BOP.

The BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates. Likewise, the reluctance to call inmates as witnesses in MSPB and arbitration proceedings places the BOP at risk of losing an adverse action appeal or an arbitration when live inmate testimony could be helpful to establish the employee's misconduct or rebut the employee's claims or defenses. Further, this reluctance could result in the BOP

---

[2] Following the OIG's discussions with ELB and LRB and after reviewing a second draft of this memorandum, the BOP for the first time told the OIG that "inmate affidavit testimony and/or inmate statements are frequently entered into evidence in both arbitration and [MSPB] proceedings." Based on this information, the OIG requested that the BOP provide any cases that depended on inmate testimony to substantiate misconduct (i.e., cases that did not involve other evidence that independently established the misconduct), in which the BOP entered inmate affidavit testimony or inmate statements in arbitration or MSPB proceedings. The only example the BOP provided did not depend on inmate testimony to substantiate misconduct because the offense was captured on video. In addition, the example did not involve sexual misconduct. We therefore remain concerned that the BOP has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, which likely affects its disciplinary decisions. At least in matters involving staff on inmate sexual assault, this practice may have the effect of requiring significantly more than the applicable preponderance of the evidence standard to sustain employee misconduct and impose discipline.

imposing unreasonably lenient penalties on staff that engage in serious misconduct because an employee does not have the right to appeal a disciplinary decision to the MSPB if the penalty consists of a suspension of less than 14 days. In addition, to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences. It also can result in the BOP failing to hold staff members accountable for patently false statements made during an investigation, as occurred in the OIG investigation described above. Moreover, not relying on inmate testimony absent independent evidence establishing the misconduct, such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject, is inconsistent with the federal court practice in criminal cases, and arbitrarily and unjustifiably dismisses inmate testimony, which may be highly credible and provided by several inmates.

In this memorandum, the OIG makes three recommendations to address the concerns we identified.

**Relevant Authorities**

**Laws, Regulations, and Policies Governing Adverse Actions Against BOP Employees**

Federal agencies may take adverse actions against employees for "such cause as will promote the efficiency of the service." 5 U.S.C. §§ 7503(a), 7513(a); 5 C.F.R. § 752.202(a), 752.403(a). An employee against whom an adverse action involving removal, suspension of more than 14 days, reduction in grade or pay, or furlough of 30 days or less is taken has the right to appeal to the Merit Systems Protection Board (MSPB). 5 U.S.C. § 7513(d); 5 C.F.R. § 752.405(a). The MSPB will sustain the agency's decision if it is supported by a preponderance of the evidence. 5 U.S.C. § 7701(c)(1)(B); 5 C.F.R. § 1201.56(b)(1)(ii). The MSPB "has authority . . . to issue a subpoena requiring the attendance and testimony of any individual regardless of their location. . ." 5 C.F.R. § 1201.81(a). "Parties who wish to obtain subpoenas that would require the attendance and testimony of witnesses . . . should file their motions for those subpoenas with the [MSPB] judge." 5 C.F.R. § 1201.81(a). Alternatively, a BOP employee against whom an adverse, disciplinary, or other grievable employment action is taken can file a grievance using the procedures set forth in the BOP's Collective Bargaining Agreement with the Council of Prison Locals, American Federation of Government Employees (Collective Bargaining Agreement). *See* 5 U.S.C. § 7121. The Collective Bargaining Agreement provides that if the grievance cannot be resolved informally, the employee can seek arbitration. Like the MSPB, the arbitrator will apply the preponderance of the evidence standard in resolving the dispute. *See* 5 U.S.C. §§ 7121(e)(2); 7701(c)(1)(B). The Collective Bargaining Agreement is silent as to whether the arbitrator has the authority to compel witnesses, and the BOP informed the OIG that the arbitrator does not have such authority. However, the Collective Bargaining Agreement permits the BOP to present witnesses who are available to testify voluntarily before the arbitrator, without limitation based on a witness's status as an inmate.[3]

The BOP has Standards of Employee Conduct that apply to all BOP employees as well as contractors and volunteers working in BOP facilities. These standards cover both criminal and administrative misconduct and set forth varying levels of discipline depending on the severity of the misconduct and number of times the employee has committed the misconduct. The BOP's OIA policy states that "all violations and allegations of violations of staff misconduct per the Standards of Employee Conduct, including criminal matters, are reported to the" OIG. If the OIG accepts the matter for investigation, the BOP will take no further action without the OIG's approval, until the OIG submits its final investigation report to the BOP. If the OIG or another criminal investigative agency does not accept the case for investigation, BOP staff who are "trained

---

[3] The OIG has not researched the question of a BOP arbitrator's ability to compel witnesses as a matter of contract or labor law. As discussed below, even assuming it is true that BOP arbitrators do not have the authority to compel witnesses, many inmates, including victim inmates, may be available to testify voluntarily.

in investigative techniques" will conduct an internal investigation.  The stated objectives of the OIA Policy include:

- Waste, fraud, abuse, mismanagement, and staff misconduct will be reduced.
- The security of [BOP] facilities and protection of the public will be enhanced by sound investigative procedures practiced by knowledgeable professionals.
- Reports will be completed accurately and promptly.

While federal law and regulations, DOJ and BOP policies, and the BOP's Collective Bargaining Agreement all require BOP employees to be treated fairly, equitably, and in a manner that is free from discrimination in adverse actions and disciplinary proceedings, there are no provisions in these authorities that require inmate testimony against employees to be disregarded, discredited or given less weight than employee testimony.  *See* 5 U.S.C. §§ 7501-7515; 5 C.F.R. Part 752; DOJ Order 1200.1, Part 3, Ch. 3-1, Discipline and Adverse Actions.

### Sexual Abuse of an Individual in Federal Custody

It is a federal crime to "knowingly [engage] in a sexual act with another person who is—(1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."  18 U.S.C. § 2243(b).  The law does not allow the "consent" of an inmate to the sexual act because an inmate can never be deemed to have consented to such activity with a BOP employee.

### Prison Rape Elimination Act

The Prison Rape Elimination Act (PREA) required the Attorney General to "publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape."  34 U.S.C. § 30307(a)(1).  The PREA regulations, regarding criminal and administrative agency investigations of sexual abuse and sexual harassment, state: "Investigators shall gather and preserve direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data; shall interview alleged victims, suspected perpetrators, and witnesses; and shall review prior complaints and reports of sexual abuse involving the suspected perpetrator."  28 C.F.R. § 115.71(c).  The PREA regulations further state: "The credibility of an alleged victim, suspect, or witness shall be assessed on an individual basis and shall not be determined by the person's status as inmate or staff."  28 C.F.R. § 115.71(e).  In addition, "[t]he agency shall impose no standard higher than a preponderance of the evidence in determining whether allegations of sexual abuse or sexual harassment are substantiated."  28 C.F.R. § 115.72.  The content of these regulations is also contained in the BOP's written PREA policy.

### The Issue

The OIG has serious concerns with the manner in which the BOP handles administrative investigations of alleged misconduct by BOP employees, including the manner in which the BOP treats inmate statements in such investigations.  These concerns arose when the OIG recently inquired of the BOP about a disciplinary action taken by the BOP following an OIG investigation.

In that OIG investigation, the OIG determined, based on the testimony of several BOP inmates as well as other evidence, that a BOP employee engaged in serious misconduct involving sexual activity with two inmates and failing to provide truthful information to the OIG.  The OIG based its findings on, among other things, the testimony of the two inmate-victims, the testimony of two inmate-eyewitnesses, the testimony of other inmates, and corroborating video evidence.  The OIG found the inmates to be credible and the BOP employee to be incredible, and the OIG delineated the reasons for those credibility determinations in its report of investigation.  After the matter was declined for criminal prosecution, the OIG forwarded its report of investigation detailing the evidence of the employee's misconduct to the BOP.

The BOP's disciplinary action for this misconduct was limited to a suspension for a period of ten days. The BOP's OIA informed the OIG that the penalty was based on the BOP's finding that the employee's substantiated misconduct was limited to an appearance of an inappropriate relationship with an inmate, not the sexual misconduct or failing to provide truthful information findings described in the OIG's report of investigation. Specifically, the OIA told the OIG that it determined that it did not have sufficient evidence to conclude that the BOP employee sexually abused either inmate or lied to the OIG. Accordingly, before forwarding the OIG's report of investigation to the BOP's Employment Law Branch (ELB) and the institution where the employee worked, the OIA attached a coversheet which listed the only sustained misconduct as "Appearance of Inappropriate Relationship" rather than what the OIG views as the more serious sexual misconduct and failure to provide truthful information findings sustained by the OIG. Consistent with the OIA's coversheet and contrary to the OIG's report, the Warden of the institution, in consultation with ELB, then disciplined the employee for ten days for the appearance of an inappropriate relationship with an inmate. The BOP's disciplinary decision was consistent with the BOP employee's account that he conversed with an inmate alone in a dark office but did not engage in sexual misconduct. We noted that, because an employee does not have the right to appeal a disciplinary decision to the MSPB if the penalty consists of a suspension of less than 14 days, the 10-day suspension did not subject the BOP to the risk of an MSPB proceeding where the BOP could have been required to rely on inmate testimony.

When the OIG asked the OIA for an explanation regarding the BOP's disciplinary decision, the OIA informed the OIG that the BOP did not find the employee responsible for sexual misconduct or failure to provide truthful information to the OIG, because those OIG findings depended on the testimony of inmates. The OIA explained that when a case has been declined for criminal prosecution the BOP does not rely on inmate statements alone to make administrative misconduct findings and impose disciplinary action against BOP employees. Rather, according to OIA, the BOP will substantiate misconduct only if there is evidence aside from the inmate testimony that independently establishes the misconduct, such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject. However, as noted above, video evidence established that the employee failed to provide truthful information to the OIG about whether he has a practice of leaving the lights off while in his office, a question that was material to the issue of whether the employee was engaged in sexual misconduct while in his office with an inmate with the lights off.

The OIA informed the OIG that the BOP will not rely on inmate statements alone to substantiate employee misconduct or impose discipline, based on concerns about the credibility of inmate testimony and the BOP's inability to compel inmates to testify in the BOP's internal administrative proceedings or in an arbitration to the extent an employee files a grievance and seeks arbitration related to a BOP disciplinary action. The OIA further stated that the BOP uses inmate statements in administrative proceedings solely for investigative lead purposes. The OIA informed the OIG that the BOP adheres to this practice regardless of evidence supporting the credibility of an inmate's statement. The OIA stated that the BOP follows this practice even when there are multiple inmates with corroborating accounts, such as in the OIG investigation described above in which there were multiple victims who alleged sexual abuse by the same BOP employee and multiple eyewitnesses. The OIA expressed the view, which was echoed in the BOP's response to the OIG's draft memorandum, that if a case is not strong enough to be accepted for criminal prosecution, the inmates' testimony is insufficient to support an administrative finding.

The OIG is troubled by what we found to be the BOP's reluctance to rely on inmate testimony in misconduct investigations and disciplinary proceedings, and general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, which the OIG believes creates significant risks for the BOP in its handling of administrative misconduct matters. First, the OIG's view is that each administrative case should be assessed based on its own merits and the credibility of each witness should be assessed

6

individually.  While some inmates may be unwilling to testify or may appropriately be found to lack credibility due to motivations to fabricate or lack of sufficient corroborating evidence, other inmates may be willing, and in some cases have a strong incentive to testify, and may appropriately be assessed as credible based on corroborating evidence, the absence of a motivation to fabricate, or other indications of credibility.  Indeed, in the investigation described above, the victims' testimony was corroborated by one another, two additional eyewitnesses, and video, and there were factors the OIG relied on to assess that the victims did not have motivations to fabricate the allegations.  In addition, the inmates were willing to and did testify in the OIG's investigation, which alleviated the need for the BOP to seek the inmates' testimony in its own administrative proceedings.  We recognize that if the employee had sought arbitration, the BOP may not have been able to compel the inmates to testify.  However, there was no reason to assume that the four inmates who testified in the OIG investigation would have been unwilling to testify voluntarily before an arbitrator.  Moreover, to the extent the BOP had to defend an appeal by the subject before the MSPB rather than an arbitrator, the BOP could have sought a subpoena requiring the inmates' appearance and testimony, which the MSPB has the authority to issue regardless of the witnesses' locations.  5 C.F.R. § 1201.81(a).  Despite the fact that the OIG credited the inmates' testimony and specifically found that the BOP employee was not credible, the BOP made a disciplinary decision that was inconsistent with the inmates' accounts and consistent with the BOP employee's account.  In effect, the BOP, without conducting any investigative steps of its own, rejected the OIG's conclusions that were based on a complete investigation including factual findings and analysis.  The OIG, therefore, found that the BOP's disciplinary decision was unsupported by the factual record.  Moreover, the OIA's view that it cannot rely on inmate testimony absent independent evidence establishing the misconduct, such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject, is inconsistent with federal court practice by arbitrarily and unjustifiably dismissing inmate testimony regardless of corroborating evidence.  By contrast, in matters accepted for prosecution, inmate testimony alone, or with corroborating evidence, is often sufficient to support criminal convictions of BOP employees.  There is no valid reason for the BOP to decline to rely on such testimony absent independent evidence establishing the misconduct in administrative matters.

In addition, this BOP reluctance to rely on inmate testimony in misconduct investigations and disciplinary proceedings, and general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, is potentially contrary to PREA regulations, which specifically state that, "[t]he credibility of an alleged victim, suspect, or witness shall be assessed on an individual basis and shall not be determined by the person's status as inmate or staff."  28 C.F.R. § 115.71(e).  Further, the view that the declination of criminal prosecution meant that the inmates' testimony was not strong enough to support administrative findings is contrary to the distinct burdens of proof in administrative and criminal cases.  Specifically, while criminal cases must be proven beyond a reasonable doubt, administrative cases, including PREA cases, need only be proven by a preponderance of the evidence.  See 5 U.S.C. §§ 7121(e)(2); 7701(c)(1)(B); 5 C.F.R. § 1201.56(b)(1)(ii).  The BOP appears to fail to appreciate this significant difference in the applicable evidentiary standards.

After reviewing a draft of this memorandum, the BOP suggested that the OIG speak with representatives of the BOP's ELB and the BOP's Human Resource Management Division Labor Relations Branch (LRB).  Following our discussions with these representatives, the OIG continues to have serious concerns about the BOP's treatment of inmate statements in administrative investigations and overall handling of alleged misconduct by BOP employees.  The LRB informed the OIG that it is not involved in employee misconduct matters, and that it is therefore unaware of how the BOP treats inmate statements in connection with such matters.  However, the LRB informed the OIG that it would avoid calling an inmate as a witness in a Union arbitration due to logistical concerns with transporting the inmate and litigation risk, specifically the risk that the inmate would be asked on cross examination about the crimes that led to the inmate's incarceration.  The ELB told the OIG that the BOP assesses allegations of employee misconduct on a case-by-case basis and

does not have a practice of rejecting or discounting inmate testimony. Yet, the ELB also told the OIG that the BOP avoids calling inmates as witnesses in MSPB and arbitration proceedings if the BOP can rely on other evidence, due to its assessment of litigation risk. The ELB could not provide an example to the OIG of an instance when the BOP had called an inmate witness in such proceedings.

With regard to the specific misconduct investigation described above that led to the OIG's inquiry, the ELB informed the OIG that, in hindsight, the ELB might substantiate a different charge or impose a higher penalty than the ten-day suspension. However, the ELB continued to state that the BOP would not charge the subject with sexual abuse due to a lack of sufficient evidence corroborating the inmate testimony that the employee had sexually abused inmates. Moreover, the ELB questioned how the ELB could prove the sexual misconduct in an appeal before the MSPB or an arbitrator, and stated that the BOP would be able to prove only that the inmate was in a darkened room with the BOP employee for nine minutes. The ELB did not seem to consider that the BOP could prove the sexual misconduct by calling the inmates as witnesses. As noted, the available evidence provided proof beyond a reasonable doubt to secure a criminal conviction of the employee in a subsequent prosecution.[4]

Based on these and other representations from OIA, LRB, and ELB, the OIG found that, while the BOP does not have a formal policy of categorically rejecting inmate testimony, the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations and has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings. We further found that, at least in matters involving staff on inmate sexual assault, the BOP is effectively requiring significantly more than the applicable preponderance of the evidence standard to sustain employee misconduct and impose discipline. In addition, the OIG found that OIA and ELB have differing views of how inmate testimony should be treated in employee misconduct investigations and that the BOP does not have a formal policy addressing this issue, which has resulted in confusion and inconsistency in the views of different branches within BOP's OGC. This issue has the potential to lead to the mishandling of disciplinary actions. These concerns exist both in cases that are initially investigated by OIA and in cases that are investigated by the OIG.

The OIG further believes that the BOP is disproportionately concerned about the risk of losing an adverse action appeal to the MSPB to the exclusion of other highly significant risks. Specifically, by being reluctant to rely on inmate testimony due to its assessment of litigation risk and effectively requiring significantly more than the preponderance of the evidence to sustain employee misconduct, the BOP enhances the likelihood

---

[4] Following the OIG's meeting with the ELB, the ELB provided the OIG an example of a case in which the ELB stated that the BOP sustained sexual misconduct based on inmate testimony. In that case, the OIG substantiated sexual misconduct and introduction of contraband, among other acts of misconduct, by a BOP employee based on the testimony of four inmate victims, a search of the employee that revealed contraband on his person, and other evidence. OIA forwarded the OIG's investigative report, along with a coversheet, to ELB and the Warden of the institution where the employee worked. However, like the OIA coversheet in the case described above that led to this memorandum, the OIA coversheet for the case described in this footnote did not include the OIG's serious sexual misconduct finding but rather included an "Appearance of an Inappropriate Relationship" finding. This alternate finding by OIA was provable by evidence independent of the inmate testimony that would have been required to sustain the OIG's serious sexual misconduct finding. The Warden, however, made a sexual misconduct finding that was consistent with the OIG's findings and contrary to the OIA's coversheet.

We found that this case and the OIA coversheets are a further indication of OIA's practice of not substantiating sexual misconduct based solely on inmate testimony. We are concerned that OIA coversheets that are inconsistent with the OIG's findings in such cases could result in Wardens disregarding the OIG's findings in favor of OIA's findings, leading to inappropriately low penalties, as occurred in the case that led to this memorandum. Further, although the Warden sustained serious misconduct findings and removed the BOP employee in the case described in this footnote, there was non-inmate testimony that independently proved one of the serious offenses, Introduction of Contraband, which supported the employee's removal.

that employees who have engaged in serious misconduct, including sexual abuse of a ward, will avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential for serial misconduct. Likewise, the reluctance to call inmates as witnesses in MSPB and arbitration proceedings places the BOP at risk of losing in such proceedings when live inmate testimony could be helpful to establish the employee's misconduct or rebut the employee's claims or defenses. It also may result in the BOP imposing unreasonably lenient disciplinary penalties for serious misconduct by staff in order to avoid an employee being able to appeal to the MSPB, because an employee does not have the right to appeal a disciplinary decision to the MSPB if the penalty consists of a suspension of less than 14 days. In addition, to the extent that the BOP's reluctance to rely on inmate testimony in administrative matters is known to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences. Indeed, the BOP employee in the investigation described above was accused of multiple additional acts of sexual misconduct against multiple BOP inmates following his suspension, and was ultimately convicted of engaging in a sexual act with one of the inmate victims described above, in violation of 18 U.S.C. § 2243(b). Such reluctance also can result in the BOP failing to hold staff members accountable for patently false statements made during an investigation, as occurred in the OIG investigation described above.

## Conclusions

The OIG has serious concerns that that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees. The OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP.

## Recommendations

The OIG recommends that the BOP:

1. Immediately notify all BOP employees involved with administrative misconduct and disciplinary matters, in writing, that all administrative misconduct cases must be handled on a case-by-case basis and that there is no prohibition against substantiating employee misconduct based on inmate testimony.

2. Create a policy regarding the proper handling of inmate statements in administrative matters. At a minimum, this policy, like the BOP's Prison Rape Elimination Act Policy, should require the credibility of alleged victims, suspects, and witnesses in all administrative proceedings to be assessed on an individual basis and not be determined solely based on the person's status as inmate or staff.

3. In consultation with the Department, provide training to all BOP employees involved with administrative misconduct and disciplinary matters on the preponderance of the evidence standard and the proper treatment of inmate statements.

The OIG provided a draft of this memorandum to the BOP, and the BOP's response is incorporated as Appendix 1. The BOP indicated in its response that it agreed with Recommendations 1 and 3 but disagreed with Recommendation 2. Appendix 2 provides the OIG's analysis of the BOP's response and a summary of the action necessary to close the recommendations. The OIG requests that the BOP provide an update on the status of its response to the recommendations within 90 days of the issuance of this memorandum. If

you have any questions or would like to discuss the information in this memorandum, please contact me at (202) 514-3435 or Sarah E. Lake, Assistant Inspector General for Investigations, at (202) 616-4730.

cc:    Bradley Weinsheimer
       Associate Deputy Attorney General
       Department of Justice

# Appendix 1:  The BOP's Response



**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Office of the Director*                    *Washington, DC 20534*

September 29, 2022

MEMORANDUM FOR SARAH E. LAKE
                ASSISTANT INSPECTOR GENERAL
                INVESTIGATIONS DIVISION

FROM:         Colette S. Peters, Director

SUBJECT:      Response to the Office of Inspector General's (OIG)
              Formal Draft of a Management Advisory Memorandum:
              <u>Notification of Concerns Regarding the Federal
              Bureau of Prisons' (BOP) Treatment of Inmate
              Statements in Investigations of Alleged Misconduct
              by BOP Employees</u>

The Bureau of Prisons (BOP) appreciates the opportunity to formally
respond to the Office of the Inspector General's above- referenced
draft Management Advisory Memorandum (MAM). The BOP offers the
following comments regarding the draft MAM and its recommendations.

The MAM notes that concerns arose when OIG inquired about a
disciplinary action taken by BOP following an investigation of
alleged sexual abuse by a BOP employee. It reports that BOP's
Office of Internal Affairs (OIA) informed OIG that in cases that
have not been accepted for criminal prosecution, the BOP will
not rely on inmate testimony to make administrative misconduct
findings and take disciplinary action against BOP employees,
unless there is other corroborating evidence. The MAM reports
that BOP also stated that OIA uses inmate statements in
administrative proceedings solely for investigative lead
purposes. OIG concluded that the BOP has a reluctance to use
inmate statements or inmate testimony when defending
disciplinary challenges before the Merit Systems Protection
Board (MSBP) and in labor arbitrations.

OIG Formal Draft MAM: BOP Treatment of Inmate Statements
September 29, 2022
Page 2 of 3

When provided an opportunity to comment, the BOP clarified that
inmate statements are used for investigative leads. OIA
routinely collects inmate statements during investigations which
are relied upon during the course of the investigation. The BOP
further clarified that its Employment Law Branch (ELB), which
defends the Agency in administrative fora, uses the
preponderance of the evidence standard and considers all
evidence provided in the sustained case, to include inmate
statements.

Notwithstanding the BOP's attempts to clarify the underlying
premise of the MAM, OIG concluded that the manner in which
employee misconduct is handled by BOP is contrary to federal
regulation and BOP policy. This conclusion is particularly
troubling with respect to its conclusion regarding the
Employment Law Branch. ELB attorneys defending cases before MSPB
and in arbitration are DOJ attorneys and abide by 28 U.S.C. §
530B, *Ethical standards for attorneys for the Government*, as
well as their individual state bar ethical standards. ELB
attorneys routinely assess their cases and use their legal
discretion to appropriately defend each case.

**Recommendation One:** Immediately notify all BOP employees
involved with administrative misconduct and disciplinary
matters, in writing, that all administrative misconduct cases
must be handled on a case-by-case basis and that there is no
prohibition against substantiating employee misconduct based on
inmate testimony.

**BOP's Response:** BOP will comply with the recommendation. As
noted previously, BOP does handle administrative misconduct
cases on a case-by-case basis and does not categorically dismiss
inmate testimony. Notwithstanding BOP's objection to the
premise, BOP's General Counsel will provide a memorandum
notification, as requested, to all OIA and ELB employees.

**Recommendation Two:** Create a policy regarding the proper
handling of inmate statements in administrative matters. At a
minimum, this policy, like BOP's Prison Rape Elimination Act
Policy, should require the credibility of alleged victims,
suspects, and witnesses in all administrative proceedings to be
assessed on an individual basis and not be determined solely
based on the person's status as inmate or staff.

**BOP's Response:** BOP has significant concerns with this
recommendation. First, all BOP policy requires labor-management

OIG Formal Draft MAM: BOP Treatment of Inmate Statements
September 29, 2022
Page 3 of 3

negotiation. This recommendation would subject BOP's
investigative practices and litigation strategies to labor-
management negotiations. Particularly with respect to litigation
strategy, this potentially causes ethical dilemmas by limiting
attorney discretion and the inherent leeway afforded to
practicing litigators to make strategic decisions in defense of
their cases. ELB attorneys appropriately handle their
responsibilities to their client - the Agency - as required by
their state bar and 28 U.S.C.§ 530B. Second, to create a policy
exposes BOP to legal challenges as to whether the agency
complied with the policy. OIA agents and ELB attorneys could be
called to testify at arbitration and unfair labor practice
challenges about the extent to which this policy controlled
discretionary decisions.

BOP would be amenable to including training material on the
proper handling of inmate statements in OIA and ELB training
curriculum.

**Recommendation Three:**  In consultation with the Department,
provide training to all BOP employees involved with
administrative misconduct and disciplinary matters on the
preponderance of the evidence standard and the proper treatment
of inmate statements.

**BOP's Response:** BOP agrees with the recommendation. It notes
that BOP employees have already received training insofar as
BOP's OIA and ELB employees have a robust understanding of the
preponderance of the evidence standard, as they investigate and
practice in administrative forum daily.

# Appendix 2:  Office of Inspector General Analysis of the BOP's Response

The OIG provided a draft of this memorandum to the BOP, and the BOP's response is incorporated as Appendix 1.  The BOP indicated in its response that it agreed with Recommendations 1 and 3 but disagreed with Recommendation 2.

The following provides OIG's analysis of the BOP's response and a summary of the action necessary to close the recommendation.  The OIG requests that the BOP provide an update on the status of its response to the recommendation within 90 days of the issuance of this memorandum.

**Recommendation 1:** Immediately notify all BOP employees involved with administrative misconduct and disciplinary matters, in writing, that all administrative misconduct cases must be handled on a case-by-case basis and that there is no prohibition against substantiating employee misconduct based on inmate testimony.

**Status:**  Resolved.

**BOP Response:**  The BOP reported the following:

BOP will comply with the recommendation.   As noted previously, BOP does handle administrative misconduct cases on a case-by-case basis and does not categorically dismiss inmate testimony.  Notwithstanding BOP's objection to the premise, BOP's General Counsel will provide a memorandum notification, as requested, to all OIA and ELB employees.

**OIG Analysis:**  The BOP's response is partially responsive to the recommendation.  The OIG recommends that in addition to providing a memorandum notification to OIA and ELB employees, the BOP provide a memorandum notification to institution staff, including Wardens and Human Resources staff who are involved in administrative misconduct and disciplinary matters.  The OIG will consider whether to close this recommendation after the BOP (1) notifies all BOP employees involved with administrative misconduct and disciplinary matters, in writing, that all administrative misconduct cases must be handled on a case-by-case basis and that there is no prohibition against substantiating employee misconduct based on inmate testimony; and (2) provides a copy of the notification to the OIG.

**Recommendation 2:** Create a policy regarding the proper handling of inmate statements in administrative matters.  At a minimum, this policy, like the BOP's Prison Rape Elimination Act Policy, should require the credibility of alleged victims, suspects, and witnesses in all administrative proceedings to be assessed on an individual basis and not be determined solely based on the person's status as inmate or staff.

**Status:**  Unresolved.

**BOP Response:**  The BOP reported the following:

The BOP has significant concerns with this recommendation.  First, all BOP policy requires labor-management negotiation.   This recommendation would subject BOP's investigative practices and litigation strategies to labor-management negotiations.  Particularly with respect to litigation strategy, this potentially causes ethical dilemmas by limiting attorney discretion

and the inherent leeway afforded to practicing litigators to make strategic decisions in defense of their cases.  ELB attorneys appropriately handle their responsibilities to their client—the Agency—as required by their state bar and 28 U.S.C. § 530B.  Second, to create a policy exposes BOP to legal challenges as to whether the agency complied with the policy.  OIA agents and ELB attorneys could be called to testify at arbitration and unfair labor practice challenges about the extent to which this policy controlled discretionary decisions.

BOP would be amenable to including training material on the proper handling of inmate statements in OIA and ELB training curriculum.

**OIG Analysis:**  While the OIG agrees that the BOP should include training material on the proper handling of inmate statements in OIA and ELB training curriculum, as reflected by Recommendation 3, the BOP's response does not address Recommendation 2, and the OIG does not find the BOP's concerns noted in its response relevant or compelling.  The PREA regulations, regarding criminal and administrative agency investigations of sexual abuse and sexual harassment, state: "The credibility of an alleged victim, suspect, or witness shall be assessed on an individual basis and shall not be determined by the person's status as inmate or staff." 28 C.F.R. § 115.71(e).  The PREA regulations further state: "The agency shall impose no standard higher than a preponderance of the evidence in determining whether allegations of sexual abuse or sexual harassment are substantiated." 28 C.F.R. § 115.72.  The content of these regulations is contained in the BOP's written PREA policy.  Given that the BOP's policies already address the proper handling of inmate statements in administrative agency investigations of sexual abuse and sexual harassment, to be consistent, BOP's policy should require the same handling of inmate statements in other types of administrative matters, regardless of whether implementing such a policy may implicate labor-management negotiation.  In addition, the OIG finds unpersuasive the concerns noted in the BOP's response that the OIG's recommended policy would limit "attorney discretion" or limit "the inherent leeway afforded to practicing litigators to make strategic decisions in defense of their cases." The OIG's recommended policy would allow BOP attorneys the discretion to assess the credibility of an alleged victim, suspect, or witness. However, BOP attorneys should not have the discretion to discredit witness testimony solely because the witness is an inmate.  Moreover, 28 U.S.C § 530B, a statute requiring federal government attorneys to abide by the laws, rules, and professional responsibility requirements of each state in which they are engaged in their duties, does not relate in any manner to the proper handling of inmate statements.

The OIG will consider whether to close this recommendation after the BOP (1) creates a policy regarding the proper handling of inmate statements in administrative matters, which, at a minimum, requires the credibility of alleged victims, suspects, and witnesses in all administrative proceedings to be assessed on an individual basis and not be determined solely based on the person's status as inmate or staff ; and (2) provides a copy of the policy to the OIG.

**Recommendation 3:** In consultation with the Department, provide training to all BOP employees involved with administrative misconduct and disciplinary matters on the preponderance of the evidence standard and the proper treatment of inmate statements.

**Status:** Resolved.

**BOP Response:**  The BOP reported the following:

BOP will comply with the recommendation.  It notes that BOP employees have already received training insofar as BOP's OIA and ELB employees have a robust understanding of the preponderance of the evidence standard, as they investigate and practice in administrative forum daily.

**OIG Analysis:**  The BOP's response is responsive to the recommendation.  The OIG will consider whether to close this recommendation after the BOP (1) in consultation with the Department, provides training to all BOP employees involved with administrative misconduct and disciplinary matters on the preponderance of the evidence standard and the proper treatment of inmate statements; (2) notifies the OIG which employees have received the training; and (3) provides a summary of the training and copies of the training materials to the OIG.

## DECLARATION OF MAILING:

1, Khalfan Khi Mohamed, declares here under penalty of perjury pursuant to 28 U.S.C §1746 that the following is true and correct:

On August 8, 2023 I have submitted for mailing to the appropriate ADX staff member my "Motion for Judicial notice" in for the attached exhibits, as a legal mail that meets all ADX-requirements for legal mail and sufficient amount of postage stamps for the first class mailing. The legal mailed addressed to:

Office of the clerk
United States District Court
901-19th st, Room A 105
Denver, Co 80294-3589.

Dated, August 8, 2023.

Khalfan Khi Mohamed
ADX Super Max, P.O Box 8500
Florence, Co 81226-8500

Khalfan Khi Mohamed
S/ Mohammed

Khayan Kh. Mohamed #44623-054
U.S.P-max. P.O Box 8500
Florence CO 81226-8500

legal mail

Office Of the Clerk
United States District Court
901-19 th st. Room A105
Denver CO 80294-3589

legal mail

UNITED STATES POSTAGE
PITNEY BOWES
U.S. OFFICIAL MAIL
PENALTY FOR
PRIVATE USE $300
$ 000.000
02 1P
0000007269   AUG 09 2023
MAILED FROM ZIP CODE 81226




Legal mail-

AUG 10 2023

FEDERAL PRISON CAMP
P.O. BOX 5000
FLORENCE, COLORADO 81226

DATE: _____ "SPECIAL/LEGAL MAIL"

The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosed to the above